BELOSKURSKY *v.* JOZWIAK.

1. VENDOR AND PURCHASER—FRAUD—RESCISSION—EVIDENCE—SUFFICIENCY.

In a suit by the vendee to rescind a contract for the purchase of 120 acres of unimproved wild land, on the ground of false representations, the finding of the court below that said false representations were made, *held*, supported by the record.

2. ESTOPPEL—EQUITABLE DEFENSE.

Estoppel is an equitable defense.

3. VENDOR AND PURCHASER—FRAUD—RESCISSION—LACHES—ESTOPPEL.

Where the vendee in a land contract had no experience in farming or farm land values, had confidence in defendant, and gradually learned that he had been deceived, the fact that he was induced by defendant's promises of relief to continue on the farm another year, would not estop him from seeking equitable relief when he became fully convinced that he had been defrauded, although the suit for rescission was not commenced until two years after the execution of the contract; defendant's position not being changed for the worse thereby.

The question of the representations by vendor as to quality or condition of soil is discussed in a note in L. R. A. 1917C, 273.

Appeal from Alcona; Widdis (Albert), J.    Submitted June 14, 1922.    (Docket No. 17.)    Decided December 29, 1922.    Rehearing denied March 23, 1923.

Bill by John Beloskursky and another against John Jozwiak and another to rescind a land contract on the ground of fraud.    From a decree for plaintiffs, defendants appeal.    Modified and affirmed.

*Herman Dehnke,* for plaintiffs.

*Kinnane, Black & Leibrand,* for defendants.

STEERE, J.    Plaintiffs are husband and wife, as are also defendants.    Plaintiffs filed this bill to recover damages under claimed rescission of a contract of purchase of 120 acres of land in Alcona county, alleged to have been induced by fraud and misrepresentation on the part of John Jozwiak, and for such other or further relief as the court might determine.

The false and fraudulent representations alleged in plaintiffs' bill as inducing them to enter into the contract are that Jozwiak assured them:

"said lands, which were wild lands, were excellently adapted to agricultural purposes; that they were well worth $30 per acre, and that such was the going market price for similar lands in the community; that improved lands of similar quality and situation were selling at prices equal to those paid for land bordering on the city of Detroit; that the land was easily cleared, and that one man could clear three or four acres of it in a day, and that stumps could be taken out at an expense of three cents each; that it would raise hay, wheat, rye and other crops equally with the best of farming land, and that the land shown plaintiffs was a fine piece of land for farming purposes, and would make him money when so used."

Defendants answered at length in denial and the case was thereafter heard on pleadings and proofs

taken in open court, resulting in a decree in plaintiffs' favor finding the material facts charged in their bill to be true, canceling the contract and awarding damages in their favor.   As plaintiff John Beloskursky and defendant John Jozwiak were the active parties in this transaction and their wives did not directly participate in the negotiations, the two litigating Johns will be referred to for convenience as plaintiff and ‿fendant.

Plaintiff was a native of Russian-Poland and spoke the Polish language.   In 1910 he came from his native country to America and located in Detroit where he found work in the Ford and other automobile factories. His wife and children came about 8 months later. He subsequently bought on contract a house and lot in Hamtramck at an agreed price of $3,700, paid $300 down and deferred payments of $50 per month.   He made $600's worth of improvements on the house and payments on his contract until his equity in the property amounted to about $1,600 in 1918.   He was then earning from $5 to $6 a day, had saved beside his investment in the house and lot about $600 and picked up some English by going to Ford school, etc., and stated when called as a witness that he did not speak it very well when he met defendant in 1918 but had "learned on the farm."   His attempt to testify in English was such that an interpreter was found necessary and most of his testimony was given through an interpreter.   He was brought in contact with defendant through a Polish-speaking real estate agent of Hamtramck named Halecki to whom he had expressed an intention to exchange his place in Hamtramck for a farm.   In Russia his employment had been on railroads.   He had never worked at farming nor ever been on a farm in this country, as he testified; knew nothing of farm lands, labor or values, qualities of soil, costs or methods of clearing or anything of

the matters as to which he claimed defendant deceived him.

Defendant was an experienced business man of Polish descent and speaking that language who had come to America when about 15 years of age and lived practically all his mature life in Michigan. He had at different times engaged in merchandizing, organized a Polish insurance society and dealt in real estate in Alcona county and other places. He had some years previous bought a quantity of cut-over land in that part of the State for $4 an acre and was engaged in promoting a colonization plan. While so engaged in selling these lands he made frequent trips to that section, and had been doing so for some time prior to the spring of 1918. He advertised in various ways and, amongst others, sent a prospectus in booklet form printed in Polish to real estate agents, and distributed copies in front of Polish churches in Detroit. Halecki had a copy of this and assisted in making the deal in question, charging plaintiff $100 for his services.

Early in the spring of 1918 negotiations reached a point where plaintiff went north with defendant to look at the 120 acres. They were accompanied by another prospective customer of defendant called by him Chowhurtski and reached Harrisville about 2 a. m. on Sunday where they first went to a hotel. During the day defendant took them to the land in question, a distance of 8 miles, and walked over a portion of it with plaintiff. He then went with his other customer to show him some land about three miles away, leaving plaintiff with a man named Stocki who lived near the 120 acres. Though not conceding he was defendant's agent, Stocki admitted he did little jobs for him, drove people around for him in his car, and furnished meals at his home to people he brought there, for all of which defendant paid him. Plaintiff testified that while defendant and the other man were

gone Stocki lauded the 120 acres he contemplated buying. It rained a part of the day and they drove back to Harrisville in the afternoon, returning south by train that night.

This 120 acres is what is known as pine stump land, unimproved and wild, grown up to brush with pine stumps scattered over it, the soil being light and sandy and unfertile, of small value for agriculture. The evidence convincingly supports the findings of the trial court that it was "practically worthless for farming" and "not worth to exceed $6 an acre."

On April 25, 1918, a lengthy contract was executed by the parties in Halecki's office under the terms of which plaintiff purchased the 120 acres in Alcona county for $3,500, $1,400 down and the balance of $2,100 in semi-annual payments of not less than $50 for the first two years and thereafter at the rate of $100 each year, at least $900 to be paid within the first 5 years, after which deed would be given and mortgage taken for the balance, with interest on all sums at any time unpaid at the rate of 6 per cent. per annum till due and 7 per cent. thereafter until paid, payable semi-annually. Subsequent paragraphs bound plaintiff to use the premises "for residential purposes only," keep the "buildings and improvements" on the place insured and in good repair, pay all taxes when due, made time "the essence of this contract," gave defendant the right to immediately declare the contract void, retain whatever had been paid with all improvements and dispossess without notice, as a tenant holding over, if plaintiff failed "to make any of the payments or perform any of the conditions above set forth, in the manner and at the time above limited therefor."

One of the many paragraphs of the contract provided that the first payment of $1,400 would be made by assignment to defendant of plaintiff's "equity in a certain land contract," covering the Hamtramck

house and lot. This was done, and in May, 1918, plaintiff, with no experience, equipment or means beyond the $600 he had saved, moved from Detroit with his family and established his home upon this unimproved 120 acres of sandy pine stump land in Alcona county.

While the testimony is in conflict as to defendant making false and fraudulent representations which induced plaintiff to make the contract and act upon it, the attending circumstances of the transaction give strong support to plaintiff's testimony upon that subject. That the representations charged in the bill were grossly untrue, if made, is undisputed. Plaintiff's positive testimony that they were made to him by defendant and relied upon has convincing circumstantial corroboration. We find no occasion to disturb the findings of the trial court upon that issue of fact.

It is further contended that plaintiff has forfeited his rights if any by laches and estoppel, in failing to promptly rescind on discovering the falsity of defendant's representations and consenting to a change in the contract thereafter. This bill was filed in May, 1920, about two years after the contract sought to be set aside was entered into. That plaintiff moved upon this tract of wild land densely ignorant of the quality of its soil, possibilities and value, with full confidence in the statements defendant made to him on that subject, is evidenced by what he did as well as what he said. He risked his all and assumed an indebtedness against it of $2,100 under a stringent contract making time of its essence. He made a *bona fide* settlement upon the land, paid $200 for lumber to build a place in which to live and built a building 16 by 14 which he thought to later use as a granary but occupied as his residence while there, bought a team and cow, cleaned up 15 or more acres of land and planted crops which scarcely returned the seed, bought

221—Mich.—21.

fence posts and set them around the 120 acres, spent
$100 sinking a well 48 feet deep, and engaged with
his wife in other efforts to improve the place and make
it produce.    He found in time by hard experience that
the soil was poor and unproductive, did not furnish
even sufficient pasture for his cow, and when he came
to dig his well 48 feet deep, discovered the soil was
"sand on top, loam about a foot, about a half foot
of gravel, and the rest white sand all the way down."
His discovery of these things was gradual.    Defend-
ant had talked to him in his native tongue as a fellow
countryman with assertions as to the then market
value of the wild land, good quality of the soil, in-
expensive clearing, market for pine stumps and glow-
ing assertions of future possibilities, which he testified
he believed and acted upon and when, as plaintiff testi-
fies, he told him he was not a farmer and did not
know about farm land, defendant ostensibly put him-
self in his place, replying, "I got children too, big
family, I don't cheat any man.    I know how it is to
live."    His doubts only developed as they were forced
on him by hard experience.    In the fall of 1918 after
his first summer's efforts, he made complaint to de-
fendant indicating that things were not as repre-
sented, to which the latter replied that if plaintiff was
not satisfied he would sell the place for him as soon
as he could, and loaned him $25 for his immediate
necessities.    In April, 1919, when plaintiff intimated
a purpose to leave the place and said he "couldn't
make it go," defendant said he would help him out,
promised that when the place was improved a little
more he would sell it for him, made him a further
loan of $175 and induced him to try the land for
another season.    He again bought seed, cultivated his
cleared land and planted crops, which proved a failure
as before.

At the time defendant persuaded plaintiff to continue

on the place by such assurances and loan of $175, his method of evidencing the increased indebtedness was by their signing an exact copy of their land contract of April 25, 1918, date and all, except that he changed the terms of down payments of $1,400 in the original to $1,600 in the copy. Plaintiff signing this copy and remaining on the place for another season is urged as an estoppel.

Estoppel is an equitable defense. The circumstances of this case do not show conditions making it inequitable to require defendant to respond because of plaintiff's delay and failure to do that which in fairness and equity he should have done. He had faith in defendant, was not suspicious of him until the truth by slow degrees was forced upon him, and on defendant's persuasion and promises delayed from prompter action. During much of the elapsing time his claim was under consideration for adjustment between them. Although their testimony is in direct conflict on controlling issues of fact, the testimony of both parties shows negotiations between them for adjustment of plaintiff's claims at various times after he first made complaint in the fall of 1918. Defendant's home was in Bay City and plaintiff was either on the land in Alcona county or working elsewhere to earn money to support his family. He found it difficult to communicate with defendant as he gradually realized conditions were not as represented, and got word or saw defendant when and as best he could, at various times, getting his brother to write letters to defendant, which we do not discover were answered. Asked on cross-examination:

"*Q.* Did you ever at any time go to Jozwiak and offer him back that 120 acres?" He replied:

"Yes, I drove from here with a horse to Bay City and see wife. I didn't see Jozwiak, just saw his wife. I asked him to take it back from me. I told him every

time I met him that I wanted to give him back the 124-acre farm. I told him that when I got the $25 from him and again when I got the $175 from him. Every time when I see him I tell him give back that farm. I can't live on it. Can't make one cent.

"*Q.* But you never offered to move off the farm and give it to him?

"*A.* He say 'I want to make something for you.' I wait two years. I can't wait more.

"*Q.* Did you ever offer that contract back?

"*A.* Yes, I did.

"*Q.* Where?

"*A.* Halecki's office.

"*Q.* Who was there at the time?

"*A.* Halecki and Jozwiak.

"*Q.* Did you have the paper there at Halecki's office then?

"*A.* Yes."

The story of the affair as disclosed by the record justifies the following conclusions of the trial court:

"Plaintiffs had been, prior to this time, and were at the time, protesting, and thereafter continued to protest, to defendants, that they had been defrauded; and that they did not enter into or consent to the loaning of the $200 as a compromise of their differences, but solely in reliance on defendant's assurance that their doing so would place him in position to dispose of the land again, from the proceeds of which sale they were to be held harmless. The court finds further the plaintiffs had no intention to waive any rights, and that they had no intimation or knowledge that it might be claimed they had lost or waived any rights by acceding to defendant's suggestion."

Plaintiff testified, and the circumstances bear out his claim, that there was no intention on his part to waive his right to rescind.

"A waiver may be express or implied, but in the absence of an express agreement a waiver will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his conduct the opposite party has

been misled to his prejudice into the honest belief that such waiver was intended or consented to. To make out a case of waiver of a legal right there must be a clear, unequivocal and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part." 27 R. C. L. p. 909.

The equitable basis of estoppel *in pais* is wanting here. Delay of itself does not operate as such unless in the meantime the adverse party has changed his position to his disadvantage or superior rights of third parties have intervened. No such conditions are disclosed by this record.

Before this suit was commenced defendant had sold the Hamtramck property for $3,950. As to it the court in awarding damages to plaintiff allowed him $1,400, the agreed value of his equity in it according to the canceled contract between the parties. Six hundred dollars was also awarded him as the value of improvements made on defendant's restored 120 acres. Both items, amounting to $2,000, were made a lien on said land enforceable by foreclosure proceedings. In addition to that amount the court also awarded plaintiffs the sum of $300 "for further damages sustained by them," with execution therefor. We do not find the items of this last mentioned sum satisfactorily sustained by the proofs. The decree will be modified by eliminating that amount.

So modified it will stand affirmed, without costs to either party.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.