YOUNG, J.
In this case, the trial court refused to enforce the one-year contractual limitations period contained in the insurance policy issued to plaintiffs. The trial court did so because it concluded that the one-year limitations provision was “unfair,” unreasonable, and an unenforceable adhesion clause. The Court of Appeals affirmed, and defendant Continental Insurance Company (Continental) appeals.
This case raises two fundamental questions of contract law: (1) are insurance contracts subject to a standard of enforcement different from that applicable to other contracts, and (2) under what conditions may a court disregard and refuse to enforce unambiguous contract terms?
*461 We hold, first, that insurance policies are subject to the same contract construction principles that apply to any other species of contract. Second, unless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written. We reiterate that the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of “reasonableness” as a basis upon which courts may refuse to enforce unambiguous contractual provisions.
Finally, in addition to these traditional contract principles, in this case involving an insurance contract, the Legislature has enacted a statute that permits insurance contract provisions to be evaluated and rejected on the basis of “reasonableness.” The Legislature has explicitly assigned this task to the Commissioner of the Office of Financial and Insurance Services (Commissioner) rather than the judiciary. The Commissioner has allowed the Continental insurance policy form to be issued and used in Michigan. No party here has challenged the Commissioner’s action to allow the Continental policy to be issued or used in this state.
Accordingly, we reverse the Court of Appeals decision and remand the case to the circuit court for entry of an order of summary disposition in favor of defendant.
I. FACTS AND PROCEDURAL HISTORY
Plaintiffs maintained an automobile insurance policy with defendant, which included optional coverage for uninsured motorist benefits. On May 15, 1998, plaintiffs were injured in an automobile accident. The police *462 report filed at the time of the collision did not indicate whether either party was insured. More than a year later, in September 1999, plaintiffs filed a first-party no-fault suit against defendant and a third-party suit for noneconomic damages against Charlene Haynes, the driver of the other vehicle. Only after the suit was commenced was it discovered that Haynes was uninsured. On March 14, 2000, plaintiffs submitted a claim for uninsured motorist benefits to Continental. Defendant denied the claim because it was not filed within one year after the accident, as required by the insurance policy.
In August 2000, plaintiffs filed the present action, contesting Continental’s denial of uninsured motorist benefits. Defendant filed a motion for summary disposition, relying on a limitations provision in the insurance contract that required that a claim or suit for uninsured motorist coverage “must be brought within 1 year from the date of the accident.”
The trial court denied defendant’s motion, holding that the one-year limitations period contained in the contract was unreasonable. After the Court of Appeals issued an opinion in an unrelated case,[1] defendant renewed its motion for summary disposition.
The trial court again denied defendant’s motion for summary disposition, holding that the one-year limitation was an unenforceable adhesion clause. Because the limitation was not highlighted in the contract, was not bargained for by the purchaser, and constituted a “significant reduction” in the time plaintiffs would other *463 wise have to file suit against defendant, the trial court held that it would be “totally and patently unfair” to enforce the limitation contained in the policy.
On appeal, the Court of Appeals affirmed the trial court’s decision to deny defendant’s motion for summary disposition.[2] The Court of Appeals agreed with the trial court that a one-year period of limitations was unreasonable. The panel instead imposed a three-year period of limitations, holding:
An insured may not have sufficient time to ascertain whether an impairment will affect his ability to lead a normal life within one year of an accident. Indeed, three of the factors to be considered in determining whether a serious impairment exists are the duration of the disability, the extent of residual impairment, and the prognosis for eventual recovery. Further, unless the police report indicates otherwise, the insured will not know that the other driver is uninsured until suit is filed, and the other driver fails to tender the defense to an insurance company. The insured, thus, must file suit well before the one-year period in order to assure that the information is known in time to make a claim or file suit against the insurance company within one year of the accident. Applying the standard set forth in Camelot,... we conclude that the limitation here is not reasonable because, in most instances, the insured (1) does not have “sufficient opportunity to investigate and file an action,” where the insured may not have sufficient information about his own physical condition to warrant filing a claim, and will likely not know if the other driver is insured until legal process is commenced, (2) under these circumstances, the time will often be “so short as to work a practical abrogation of the right of action,” and (3) the action may be barred before the loss can be ascertained.
*464 Here, the Legislature has provided a three-year limitations period for personal injury claims. The insured must sue the other driver within three years of the injury, whether or not the insured has sufficient information to know if a serious impairment has been sustained, and whether or not the other driver is insured. Application of the three-year period would not deprive the insured of a sufficient opportunity to investigate and file a claim and does not work a practical abrogation of the right. [Id. at 686-687 (internal citations omitted).][3]
Subsequently, we granted defendant’s application for leave to appeal.[4]
II. STANDARD OF REVIEW
This Court reviews de novo the trial court’s decision to grant or deny summary disposition.[5] In reviewing the motion, the pleadings, affidavits, depositions, admissions, and any other admissible evidence are viewed in the light most favorable to the nonmoving party.[6] Moreover, questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo.[7] In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument.[8]
*465 III. ANALYSIS
A. THE "REASONABLENESS DOCTRINE” IN MICHIGAN
Under the language of the insurance policy at issue, an insured is required to file a claim or lawsuit for uninsured motorist benefits “within 1 year from the date of the accident.” Plaintiff asks this Court to refuse to enforce that provision of the insurance contract because the limitations period is not “reasonable.” This action, being a claim arising under the insurance policy, is a first-party claim against the insurer. Therefore, contrary to the Court of Appeals conclusion that a three-year period of limitations applies to this lawsuit, plaintiffs suit against Continental — in the absence of the limitations provision contained in the policy — would be governed by the general six-year period of limitations applicable to contract actions.[9]
Uninsured motorist insurance permits an injured motorist to obtain coverage from his or her own insurance company to the extent that a third-party claim would be permitted against the uninsured at-fault driver.[10] Uninsured motorist coverage is optional — it is not compulsory coverage mandated by the no-fault act.[11] Accord *466 ingly, the rights and limitations of such coverage are purely contractual and are construed without reference to the no-fault act.[12]
In support of their claim that a contractual limitations provision may be disregarded on the basis of an assessment of “reasonableness,” plaintiffs rely on Tom Thomas Org, Inc v Reliance Ins Co.[13] In Tom Thomas, the plaintiff filed suit fifteen months after the loss to recover for property damage under an insurance policy. The policy contained a one-year limitation on filing suit.
Even a cursory reading of Tom Thomas reveals that the holding of the case was premised on “judicial tolling” rather than reasonableness. In fact, the majority in Tom Thomas specifically declined to address the reasonableness of the one-year limitation; instead, it predicated its holding on “reconciliation of the provisions of the policy” by the imposition of judicial tolling.[14] In dicta, the Court noted the “general rule” that a shortened contractual period of limitations was “valid if reasonable even though the period is less than that prescribed by otherwise applicable statutes of limitation.”[15]
*467 In Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co,[16] this Court expanded upon the “reasonableness” dicta articulated in Tom Thomas. In Camelot, the plaintiff sought payment on a labor and material bond from the defendant. The defendant moved for summary disposition on the basis of the one-year limitations period contained in the bond contract. Citing Tom Thomas for the proposition that a shortened period of limitations is acceptable “where the limitation is reasonable,”[17] Camelot relied on case law from foreign jurisdictions in articulating a three-part test for evaluating the reasonableness of a contractually shortened limitations period.[18] Ultimately, the Court held that the *468 one-year period of limitations was reasonable, and that no public policy considerations precluded enforcement of the contractual provision.
In the end, Camelot enforced the contractually shortened limitations period at issue. However, rather than simply enforcing the contract as written, the decision in Camelot was premised upon the adoption of a “reasonableness” test found in the dicta of Tom Thomas. In failing to employ the plain language of the contract, the Camelot Court erred.
A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as .written.[19] Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract. This Court has previously noted that “ ‘[t]he general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.’ ”[20]
When a court abrogates unambiguous contractual provisions based on its own independent assessment of *469 “reasonableness,” the court undermines the parties’ freedom of contract.[21] As this Court previously observed:
This approach, where judges ... rewrite the contract.. . is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance such as a contract in violation of law or public policy. This Court has recently discussed, and reinforced, its fidelity to this understanding of contract law in Terrien v Zwit, 467 Mich 56, 71; 648 NW2d 602 (2002). The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. Few have expressed the force of this venerable axiom better than the late Professor Arthur Corbin, of Yale Law School, who wrote on this topic in his definitive study of contract law, Corbin on Contracts, as follows:
“One does not have ‘liberty of contract’ unless organized society both forbears and enforces, forbears to penal *470 ize him for making his bargain and enforces it for him after it is made. [15 Corbin, Contracts (Interim ed), ch 79, § 1376, p 17.]”[22]
Accordingly, we hold that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy. A mere judicial assessment of “reasonableness” is an invalid basis upon which to refuse to enforce contractual provisions. Only recognized traditional contract defenses may be used to avoid the enforcement of the contract provision.[23] To the degree that Tom Thomas, Camelot, and their progeny abrogate unambiguous contractual terms on the basis of reasonableness determinations, they are overruled.[24]
B. THE PROVISION IS NOT CONTRARY TO LAW OR PUBLIC POLICY
We next consider whether the contractually shortened period of limitations violates law or public policy. As noted by this Court, the determination of Michigan’s *471 public policy “is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law.”[25] In ascertaining the parameters of our public policy, we must look to “policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law.”[26]
As an initial matter, we note that this Court has previously held that Michigan has “no general policy or statutory enactment. . . which would prohibit private parties from contracting for shorter limitations periods than those specified by general statutes.”[27] This is consistent with our case law, which had held that contractually shortened periods of limitations were valid, and were to be disregarded only where the insured could establish estoppel or prove that the insurer waived the contractual provision.[28]
*472 Likewise, there is no Michigan statute explicitly prohibiting contractual provisions that reduce the limitations period in uninsured motorist policies. The Legislature has proscribed shortened limitations periods in only one specific context: life insurance policies. MCL 500.4046(2).[29]
Notwithstanding the fact that the Commissioner approved for use the contract at issue in this case, the *473 Commissioner now argues to this Court that MCL 500.2254 precludes contractual periods of limitations that are less than six years. The statute provides in part:
No article, bylaw, resolution or policy provision adopted by any life, disability, surety, or casualty insurance company doing business in this state prohibiting a member or beneficiary from commencing and maintaining suits at law or in equity against such company shall be valid and no such article, bylaw, provision or resolution shall hereafter be a bar to any suit in any court in this state: Provided, however, That any reasonable remedy for adjudicating claims established by such company or companies shall first be exhausted by the claimant before commencing suit: Provided further, however, That the company shall finally pass upon any claim submitted to it within a period of 6 months from and after final proofs of loss or death shall have been furnished any such company by the claimant.
The plain language of the statute states that “[n]o . . . policy provision . . . prohibiting a member or beneficiary from commencing and maintaining [a lawsuit] against [the insurer] . . . shall be valid . . . .” (Emphasis added.) The common definition of “prohibit” is “to forbid by authority or command.”[30] Clearly, the statute proscribes contractual provisions that forbid or preclude the commencement or maintenance of a lawsuit. The statute does not, however, bar the imposition of conditions that may be placed on the commencement and maintenance of a lawsuit.[31]
*474 While nothing in our statutes explicitly addresses contractually shortened limitations periods outside the context of life -insurance policies, we note that the Legislature has provided a mechanism to ensure the reasonableness of insurance policies issued in the state of Michigan.
MCL 500.2236(1) requires that all "basic insurance policy” forms be filed with the Commissioner’s office and be approved by the Commissioner before a policy may be issued by an insurance company. If the Commissioner fails to act within thirty days after the policy form is submitted, the form is deemed approved. MCL 500.2236(1). One of the factors that the Commissioner may consider in determining whether to approve an insurance policy is the reasonableness of the conditions and exceptions contained therein. MCL 500.2236(5) and (6) provide:
(5) Upon written notice to the insurer, the commissioner may disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy. The notice shall specify the objectionable provisions or conditions and state the reasons for the commissioner’s decision. If the form is legally in use by the insurer in this state, the notice shall give the effective date of the commissioner’s disapproval, which shall not be less than 30 days subsequent to the mailing or delivery of the notice to the insurer. If the form is not legally in use, then disapproval shall be effective immediately.
(6) If a form is disapproved or approval is withdrawn under the provisions of this act, the insurer is entitled upon demand to a hearing before the commissioner or a deputy commissioner within 30 days after the notice of disapproval or of withdrawal of approval. After the hearing, the com *475 missioner shall make findings of fact and law, and either affirm, modify, or withdraw his or her original order or decision. [Emphasis added.]
Clearly, the Legislature has assigned the responsibility of evaluating the “reasonableness” of an insurance contract to the person within the executive branch charged with reviewing and approving insurance policies: the Commissioner of Insurance.[32] The statute permits, but does not require, the Commissioner to disapprove or withdraw an insurance contract if the Commissioner determines that a condition or exception is unreasonable or deceptive. The decision to approve, disapprove, or withdraw an insurance policy form is within the sound discretion of the Commissioner. In this instance, the Commissioner has approved the Continental policy form containing the shortened limitations provision for issuance and use in the state of Michigan.[33]
Our courts have a very limited scope of review concerning the decisions made by the Commissioner. MCL 500.244(1) provides that an aggrieved person may seek judicial review of an “order, decision, finding, ruling, opinion, rule, action, or inaction” of the Commissioner as provided by the Administrative Procedures Act, MCL 24.201 et seq. MCL 24.306 provides:
(1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful *476 and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:
(a) In violation of the constitution or a statute.
(b) In excess of the statutory authority or jurisdiction of the agency.
(c) Made upon unlawful procedure resulting in material prejudice to a party.
(d) Not supported by competent, material and substantial evidence on the whole record.
(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.
(f) Affected by other substantial and material error of law.
Here, plaintiffs have not challenged the decision of the Commissioner to allow issuance of the Continental policy, much less shown that the Commissioner’s decision was arbitrary, capricious, or a clear abuse of discretion.[34] Accordingly, the explicit “public policy” of Michigan is that the reasonableness of insurance contracts is a matter for the executive, not judicial, branch of government. As such, the lower courts were not free to invade the jurisdiction of the Commissioner and determine de novo whether Continental’s policy was reasonable.
C. ADHESION CONTRACTS
We turn finally to the trial court’s conclusion that the policy was an “adhesion contract” and was therefore unenforceable. The trial court’s ruling rested on the *477 assumption that “adhesion contracts” are subject to a greater level of judicial scrutiny than other contracts— and, indeed, that so-called adhesion contracts need not be enforced if the court views them as unfair. The Court of Appeals reached a similar conclusion:
We further note that the concern the Court expressed in Herweyer is present here as well. The insured had the option of accepting uninsured motorist coverage or rejecting it, but could not have bargained for a longer limitations period. Accordingly, the policy should receive close judicial scrutiny. [262 Mich App at 687][35]
The contract construction approach of the lower courts is inconsistent with traditional contract principles. An “adhesion contract” is simply that: a contracts.[36] It must be enforced according to its plain terms unless one of the traditional contract defenses applies.
Indeed, a careful examination of our contract jurisprudence reveals that the “adhesion contract doctrine” existed in Michigan solely in dicta until it was implicitly *478 adopted by this Court in Herweyer v Clark Hwy Services, Inc. Moreover, it was adopted in Herweyer without substantive analysis, and without reference to and in contravention of more than one hundred years of contrary case law from this Court.
Before turning to the state of the “adhesión contract doctrine” in our jurisprudence, it is important to begin with a sense of how the notion of an “adhesive” contract arose in the first place. The term “adhesion contract” was originally coined simply as a descriptive label for a common contract practice in the insurance industry. The term was introduced in a 1919 law review article by University of Colorado Law School professor Edwin W Patterson to describe a life insurance policy term requiring “delivery of the policy to the applicant” before the policy became effective.[37] Professor Patterson made the observation that “[l]ife-insurance contracts are contracts of ‘adhesion.’ The contract is drawn up by the insurer and the insured, who merely ‘adheres’ to it, has little choice as to its terms.”[38] Patterson noted that “a majority of the courts have strictly enforced” such contractual stipulations, although some courts had “executed successful flanking movements” to find either that the insurer had waived the requirement, or that the policy had been delivered.[39] Thus, the original designation of “adhesion contract” described a type of contract, but did not suggest that such a description rendered the contract or its provisions unenforceable.
It was not until a quarter-century later that Patterson’s label for life insurance contracts evolved into something resembling a “doctrine.” In 1943, Yale Law *479 School Professor Friedrich Kessler expanded on Patterson’s description of practices in the life insurance industry to argue that courts should simply refuse to enforce unfair provisions of “adhesion contracts” rather than utilize traditional contract law principles.[40] While conceding that “society as a whole ultimately benefits from the use of standard contracts,” Professor Kessler nonetheless maintained that such contracts were typically used by enterprises with “strong bargaining power,” and that the “weaker party” frequently could not “shop around for better terms, either because the author of the standard contract [had] a monopoly” or because all competitors used the same clauses.[41] Kessler expressed concern that “powerful industrial and commercial overlords” would impose “a new feudal order of their own making upon a vast host of vassals.”[42]
While noting that “freedom of contract has remained one of the firmest axioms in the whole fabric of the social philosophy of our culture,”[43] Kessler asserted that the meaning of “freedom of contract” varied with “the social importance of the type of contract and with the degree of monopoly enjoyed by the author of the standardized contract.”[44] Thus, Kessler advocated nonenforcement of clauses contained in standardized contracts, but only where the type of contract was of sufficient “social importance” and where the author of the contract enjoyed a monopoly over the socially important good or service.
*480 The groundwork for the “adhesion contract doctrine” was thus laid in academia, first in Patterson’s positive analysis and then in Kessler’s normative article. In Michigan, the notion was first imported into our case law in 1970. In Zurich Ins Co v Rombough,[45] the issue to be determined was whether an insurer had a duty to defend when its policy contained two apparently conflicting provisions.[46] The opinion noted that “ [i]t is elemental insurance law that ambiguous policy provisions must be construed against the insurance company and most favorably to the premium-paying insured.”[47] After noting this legal principle, the Rom-bough Court cited the following language from a California Supreme Court case to further support its rule of construction:
Justice Tobriner, writing for the California Supreme Court in the case of Gray v. Zurich Insurance Company (1966), 65 Cal 2d 263 (54 Cal Rptr 104, 419 P2d 168), construing similar provisions, said:
“In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.
“These principles of interpretation of insurance contracts have found new and vivid restatement in the doctrine of the adhesion contract. As this court has held, a contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized *481 contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a ‘take it or leave it basis’ carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.
“Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect. ”[48]
The Rombough Court concluded by purporting to “adopt” the reasoning of Gray v Zurich, holding that the policy language was “sufficiently ambiguous” to require plaintiff to provide a defense.[49]
Thus, the term “adhesion contract” was first introduced in Michigan jurisprudence in support of the rule of contra proferentem,[50] wherein contract terms are construed against the drafter in the event of an ambiguity to meet the “reasonable expectations” of the insured. However, because Rombough was decided on the basis of contra proferentem — a rule of interpretation providing that truly ambiguous contractual language is to be construed against the drafter[51] — its language *482 regarding adhesion contracts is, as we stated in Wilkie,[52] properly classified as obiter dicta.
Subsequently, in Cree Coaches, Inc v Panel Suppliers, Inc,[53] this Court referred again to the “adhesion contract” concept. The defendant in Cree Coaches had constructed a building for the plaintiff pursuant to a contract that limited the warranty to one year after the contract was completed. Six years later, the building collapsed from the weight of snow. In upholding the provisions limiting the plaintiffs warranty claims and the warranty period, the Court noted in dicta — and without analysis — that the Court did not regard the construction contract “as a contract of adhesion from which public policy would grant relief.”[54] This digression was cryptic at best, because this Court had never before declined to enforce an “adhesion contract.”
The term “adhesion contract” was discussed again a decade later in Camelot Excavating Co, Inc v St Paul Fire & Marine Ins Co.[55] In his concurring opinion, Justice LEVIN agreed with the majority that a clause in a construction insurance bond limiting the time within which the insured could bring suit to one year was enforceable. He stated, however, that “[a]n adhesion contract-such as most contracts of insurance-in which the shortened period has not actually been bargained for, or which operates to defeat the claim of an intended beneficiary not involved in the bargaining process,” would “present a different case.”[56] Again, the basis for Justice LEVIN’S assertion is unclear, because character *483 ization of an agreement as an adhesive contract had never before been pivotal in the Court’s analysis or enforcement of a contract.
The development of the notion that adhesion contracts were subject to different standards of enforcement was dealt a significant blow in Raska v Farm Bureau Mut Ins Co of Michigan.[57] There, the plaintiff brought suit for breach of an automobile policy and for a declaratory judgment that an “owned automobile” exclusion was ambiguous and should be construed against the insurer, and was void as contrary to public policy. This Court not only enforced the contractual policy exclusion, but held that “[a]ny clause in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy.”[58] In dissent, Justice WILLIAMS stated that he would have declined to enforce the contractual exclusion because “an insurance contract, as a contract of adhesion, is construed in favor of the insured,” as well as because of the “reasonable expectations” of the insured.[59] Raska, therefore, stands for the proposition that an insurance contract must be interpreted like any other contract: according to its plain unambiguous terms.
This Court’s first attempt at describing the elements of the adhesion contract doctrine — a doctrine the Court had yet to adopt — was the plurality opinion in Morris v Metriyakool.[60] There, the plaintiff signed an arbitration agreement upon admission to the hospital for medical treatment. The hospital presented the arbitration agreement pursuant to the former medical malpractice *484 arbitration act (MMAA).[61] At issue was the question whether the MMAA was unconstitutional as violative of the plaintiffs due process rights. After determining that the act did not implicate due process concerns, Justice KAVANAGH, joined by Justice LEVIN, rejected the plaintiffs assertion that the contract was one of adhesion, holding:
Contracts of adhesion are characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement. Regardless of any possible perception among patients that the provision of optimal medical care is conditioned on their signing the arbitration agreement, we believe that the sixty-day rescission period, of which patients must be informed, fully protects those who sign the agreement. The patients’ ability to rescind the agreement after leaving the hospital allows them to obtain the desired service without binding them to its terms. As a result, the agreement cannot be considered a contract of adhesion.[62]
Writing separately, Justice RYAN, joined by Justice Brickley, held that the MMAA did not violate due process concerns because there was no state action. In addressing the plaintiffs claim that the arbitration agreement was an adhesion contract, Justice RYAN stated:
A contract of adhesion is a contract which has some or all of the following characteristics: the parties to the *485 contract were of unequal bargaining strength; the contract is expressed in standardized language prepared by the stronger party to meet his needs; and the contract is offered by the stronger party to the weaker party on a “take it or leave it” basis. Therefore, the essence of a contract of adhesion is a nonconsensual agreement forced upon a party against his will. [63]
Justice RYAN agreed with the majority, however, that the contracts at issue in Morris were not adhesion contracts. Thus, while a majority of the Morris Court agreed that the contracts at issue were not contracts of adhesion, a majority could not agree on what, in fact, made a contract one of adhesion.[64]
The plurality opinion of Powers v Detroit Automobile Inter-Ins Exch[65] asserted that all insurance contracts are adhesion contracts: nonnegotiated, take-it-or-leave-it, standardized forms, drafted by “insurance and legal experts of a state, national, or international organization, hundreds and maybe thousands of miles away.”[66] The plurality opinion utilized the now-repudiated doctrine of reasonable expectations to resolve the case,[67] noting that an ambiguity was not a necessary precondition for invoking that doctrine. Thus, rather than assessing whether the contract was indeed adhesive, the Powers plurality opinion decreed that all insurance contracts were contracts of adhesion, applying the rea *486 sonable expectations doctrine without regard to ambiguity.
The concept of “adhesion contracts” took yet another turn in Auto Club Ins Ass’n v DeLaGarza,[68] The DeLaGarza majority concluded that the insurance policy at issue was ambiguous and was therefore to be construed “against the drafter of the provision and in favor of coverage.”[69] Again, in dicta, the Court endorsed the notion that certain contracts are adhesive and are therefore to be construed in favor of the insured.[70]
Finally, in Herweyer v Clark Hwy Services, Inc,[71] this Court declined to enforce the plain language of a contract arguably because the contract at issue was adhesive. Herweyer concerned the validity of a shortened limitations provision in an employment contract and the application of a saving clause that required enforcement of the contract “as far as legally possible.” In concluding that the six-month limitations period in the contract at issue was unenforceable, Herweyer cited Justice Levin’s concurring opinion in Camelot:
*487 In Camelot, Justice Levin expressed concerns about the development of a rule authorizing contractually shortened periods of limitation. He reasoned:
“The rationale of the rule allowing parties to contractually shorten statutory periods of limitation is that the shortened period is a bargained-for term of the contract. Allowing such bargained-for terms may in some cases be a useful and proper means of allowing parties to structure their business dealings.
“In the case of an adhesion contract, however, where the party ostensibly agreeing to the. shortened period has no real alternative, this rationale is inapplicable.”[72]
Solely on the basis of Justice Levin’s concurring opinion in Camelot, the Herweyer Court indicated — for the first time in this Court’s history — that a so-called “adhesion contract” was unenforceable simply because of the disparity in the contracting parties’ “bargaining power”:
We share Justice Levin’s concerns. Employment contracts differ from bond contracts. An employer and employee often do not deal at arms length when negotiating contract terms. An employee in the position of plaintiff has only two options: (1) sign the employment contract as drafted by the employer or (2) lose the job. Therefore, unlike in Camelot where two businesses negotiated the contract’s terms essentially on equal footing, here plaintiff had little or no negotiating leverage. Where one party has less bargaining power than another, the contract agreed upon might be, but is not necessarily, one of adhesion, and at the least deserves close judicial scrutiny.[73]
The Herweyer Court did not cite a single majority opinion of this Court to support its conclusion. More astonishingly, the majority failed to recognize — much less distinguish or overrule — more than a century of *488 contrary case law belying its conclusion that a shortened limitations period was unenforceable.[74]
The preceding analysis shares many similarities with our decision in Wilkie, in which we also sought to clarify this state’s contract jurisprudence. As in Wilkie, analyzing the concept of adhesive contracts in our jurisprudence requires that we confront “a confused jumble of.ignored precedent, silently acquiesced to plurality opinions, and dicta, all of which, with little scrutiny, have been piled on each other to establish authority.”[75]
Here, this “confused jumble” is exemplified by Herweyer, which held for the first time in our contract jurisprudence that an adhesion contract is subject to “close judicial scrutiny” and may be voided if the contract fails to meet the court’s satisfaction. This holding was inconsistent not only with a century of case law to the contrary,[76] but with the very principles upon which that jurisprudence is based — namely, freedom of contract and the liberty of each person to order his or her own affairs by agreement.
Today we are faced with a choice. We may follow Herweyer and its summary conclusion that “[w]here one party has less bargaining power than another, the contract agreed upon might be, but is not necessarily, one of adhesion, and at the least deserves close judicial scrutiny.”[77] Or we may, consistently with the many cases that Herweyer presumptively displaced without overruling them, hold that an adhesion contract is simply a type of contract and is to be enforced according to its plain terms just as any other contract. We choose *489 the latter course because it is most consonant with traditional contract principles our state has historically honored.
As with any contract, the “rights and duties” of a party to an adhesion contract are “derived from the terms of the agreement.”[78] A party may avoid enforcement of an “adhesive” contract only by establishing one of the traditional contract defenses, such as fraud, duress, unconscionability, or waiver.[79] As we stated in Raska,[80] and reaffirmed in Wilkie:[81]
The expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.
But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just.
Therefore, we hold that it is of no legal relevance that a contract is or is not described as “adhesive.” In either case, the contract is to be enforced according to its plain language. Regardless of whether a contract is adhesive, a court may not revise or void the unambiguous language of the agreement to achieve a result that it views as fairer or more reasonable.[82]
*490 The term “adhesion contract” may, as Professor Patterson originally intended, be used to describe a contract for goods or services offered on a take-it-or-leave-it basis. But it may not be used as a justification for creating any adverse presumptions or for failing to enforce a contract as written. To the extent that Herweyer held to the contrary, it is overruled.[83]
In this case, plaintiffs do not argue that they were fraudulently induced to sign their agreement with defendant, that they entered into the contract under duress, or that any other traditional contract defense applies.[84] Therefore, irrespective of whether their contract is labeled “adhesive” under Kessler’s standard, the competing Morris standards, or any other definition of the term, we must enforce the plain language of that agreement.[85]
*491 IV CONCLUSION
Consistent with our prior jurisprudence, unambiguous contracts, including insurance policies, are to be enforced as written unless a contractual provision violates law or public policy. Judicial determinations of "reasonableness” are an invalid basis upon which to refuse to enforce unambiguous contractual provisions. Traditional defenses to enforcement of the contract at issue, such as waiver, fraud, or unconscionability, have neither been pled nor proven. Moreover, nothing in our law or public policy precludes the enforcement of the contractual provision at issue. Finally, in the specific arena of insurance contracts, the Legislature has enacted a mechanism whereby policy provisions may be scrutinized and rejected on the basis of reasonableness. This responsibility, however, has been explicitly assigned to the Commissioner. The Commissioner has approved the policy form at issue. Plaintiffs have not challenged in the appropriate forum that this action was an abuse of discretion.
Accordingly, we reverse the Court of Appeals decision and remand for entry of summary disposition in favor of defendant.
Taylor, C.J., and Corrigan and Markman, JJ., concurred with Young, J.

 Williams v Continental Ins Co, unpublished opinion per curiam of the Court of Appeals, issued April 23, 2002 (Docket No. 229183). In Williams, the panel considered identical policy language and concluded that the one-year limitation was “not so unreasonable as to be unenforceable” because the policy required that a claim be filed within a year, rather than a lawsuit.

 262 Mich App 679; 687 NW2d 304 (2004).

 Relying on Herweyer v Clark Hwy Services, Inc, 455 Mich 14; 564 NW2d 857 (1997), the Court of Appeals agreed with the trial court that the insurance policy was adhesive and “should receive close judicial scrutiny.” 262 Mich App at 687.

 471 Mich 904 (2004).

 Van v Zahorik, 460 Mich 320; 597 NW2d 15 (1999).

 Radtke v Everett, 442 Mich 368, 374; 501 NW2d 155 (1993).

 Archambo v Lawyers Title Ins Corp, 466 Mich 402, 408; 646 NW2d 170 (2002); Bandit Industries, Inc v Hobbs Int’l, Inc (After Remand), 463 Mich 504, 511; 620 NW2d 531 (2001).

 Wilkie v Auto-Owners Ins Co, 469 Mich 41, 47; 664 NW2d 776 (2003).

 MCL 600.5807(8). If plaintiffs brought suit against the at-fault. driver instead of their own insurance carrier, such a third-party claim would be limited to being brought within three years pursuant to former MCL 600.5805(9), now MCL 600.5805(10), which governs claims for injury to person or property.

 The owner or operator of a vehicle is subject to tort liability for noneconomic loss only if the injured motorist has suffered death, serious impairment of a body function, or permanent serious disfigurement. MCL 500.3135(1); Kreiner v Fischer, 471 Mich 109; 683 NW2d 611 (2004); Auto Club Ins Ass’n v Hill, 431 Mich 449; 430 NW2d 636 (1988).

 Twichel v MIC Gen Ins Corp, 469 Mich 524, 533; 676 NW2d 616 (2004).

 Id.

 396 Mich 588; 242 NW2d 396 (1976).

 The Torn Thomas Court held that the contractual period of limitations was judicially tolled “from the time the insured gives notice until the insurer formally denied liability.” Id. at 597.

 Id. at 592 (emphasis added). In support of the “general rule,” the Tom Thomas Court cited a secondary source rather than Michigan authority. However, the opinion subsequently noted that prior Michigan case law had enforced shortened contractual limitations periods without resort to a “reasonableness” analysis. Id. at 592 n 4.
In fact, prior case law had consistently upheld the validity of contractually shortened limitations periods; such provisions could be avoided only where the insured could establish waiver on the part of the insurer or estoppel. See McIntyre v Michigan State Ins Co, 52 Mich 188; 17 NW *467 781 (1883); Law v New England Mut Accident Ass’n, 94 Mich 266; 53 NW 1104 (1892); Turner v Fidelity & Cas Co, 112 Mich 425; 70 NW 898 (1897) (insurance company waived one-year limitation by conduct); Harris v Phoenix Accident & Sick Benefit Ass’n, 149 Mich 285; 112 NW 935 (1907)(failure of the insured to sue within six months was not waived); Friedberg v Ins Co of North America, 257 Mich 291; 241 NW 183 (1932) (where settlement negotiations are broken off by the insurer near the end of the contractual limitations period, the provision was deemed waived); Hall v Metro Life Ins Co, 274 Mich 196; 264 NW 340 (1936); Barza v Metro Life Ins Co, 281 Mich 532; 275 NW 238 (1937) (the plaintiff was bound by two-year limitations clause where there was no evidence of waiver or estoppel); Bashans v Metro Mut Ins Co, 369 Mich 141; 119 NW2d 622 (1963) (insurer did not waive two-year “binding” limitations clause); Better Valu Homes, Inc v Preferred Mut Ins Co, 60 Mich App 315; 230 NW2d 412 (1975).

 410 Mich 118; 301 NW2d 275 (1981).

 Camelot also cited Barza v Metro Life and Turner v Fidelity, n 15 supra, in support of the “rule” that a contractual limitations provision may be upheld if reasonable. Camelot, supra at 126. However, neither Barza nor Turner may be properly read as requiring reasonableness before a contractual provision may be deemed valid. In both cases, the analysis focused on whether the insurer waived the otherwise binding limitations provision.

 Camelot held that a contractually shortened limitations period is reasonable if (1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical *468 abrogation of the right of action, and (3) the action is not barred before the loss or damage can be ascertained. Id. at 127.

 Harrington v Inter-State Business Men’s Accident Ass’n, 210 Mich 327; 178 NW 19 (1920); Indemnity Ins Co of North America v Geist, 270 Mich 510; 259 NW 143 (1935); Cottrill v Michigan Hosp Service, 359 Mich 472; 102 NW2d 179 (1960); Henderson v State Farm Fire & Cas Co, 460 Mich 348; 596 NW2d 190 (1999); Cruz v State Farm Mut Automobile Ins Co, 466 Mich 588; 648 NW2d 591 (2002).

 Terrien v Zwit, 467 Mich 56, 71; 648 NW2d 602 (2002), quoting Twin City Pipe Line Co v Harding Glass Co, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931).

 Justice Kelly maintains that reviewing contract provisions for “reasonableness” is “essential in order to accurately implement the intent of the contracting parties.” Post at 495. However, it is difficult to rationalize implementing the intent of the parties by imposing contractual provisions that are completely antithetic to the provisions contained in the contract. Rather, the intent of the contracting parties is best discerned by the language actually used in the contract. As this Court noted in Quality Products & Concepts Co v Nagel Precision, Inc, 469 Mich 362, 375; 666 NW2d 251 (2003), “an unambiguous contractual provision is reflective of the parties’ intent as a matter of law.”

 Wilkie, supra at 51-52.

 Examples of traditional defenses include duress, waiver, estoppel, fraud, or unconscionability. See Quality Products & Concepts Co, supra (waiver); Beloskursky v Jozwiak, 221 Mich 316; 191 NW 16 (1922) (estoppel); Hackley v Headley, 45 Mich 569; 8 NW 511 (1881) (duress); Witham v Walsh, 156 Mich 582; 121 NW 309 (1909) (fraud); Gillam v Michigan Mortgage-Investment Corp, 224 Mich 405; 194 NW 981 (1923) (unconscionability).

 Justice Kelly maintains that the Camelot Court “applied a very old and well tested legal rule” when it adopted the so-called “reasonableness doctrine.” Post at 496. However, as even the Tom Thomas Court recognized, Michigan jurisprudence enforced contractually shortened limitations provisions without regard to the “reasonableness” of the provisions. See n 15 of this opinion. Citation of case law from other jurisdictions simply (¡loes not alter the fact that the “very old and well tested legal rule” of Michigan eschewed using “reasonableness” as a basis for abrogating contractually shortened limitations provisions.

 Terrien, supra at 67.

 Id. at 66-67.

 Camelot, supra at 139.

 See n 15 of this opinion. Amicus cites Price v Hopkin, 13 Mich 318 (1865), and Lukazewski v Sovereign Camp of the Woodmen of the World, 270 Mich 415; 259 NW 307 (1935), in support of the claim that Michigan case law has a “long-standing policy” of disregarding “unreasonable” contractual limitations periods. However, both cases are distinguishable.
In Price, the Legislature shortened a statute of limitations from twenty to fifteen years, giving the amendment retroactive effect. The plaintiffs grantor “was entitled by the existing statutes to bring her action within twenty years,” but the statutory amendment immediately severed her cause of action. Price, supra at 323-324. Justice Cooley held that the retroactive statutory amendment was unconstitutional as violative of due process because it annihilated a vested right without permitting a “reasonable time” to bring the lawsuit. Id. at 324-328.
Likewise, Lukazewski is also distinguishable. There, the plaintiff was *472 the beneficiary of a life insurance policy that required “proof of the insured’s actual death.” The policy also required that all lawsuits be commenced within one year from the date of death. The insured disappeared in 1925, but proof of his death was not established until 1932. The defendant “denied liability on the ground that both the contractual and statutory limitations” had expired. Lukazewshi, supra at 417-418.
The Lukazewshi Court held that, because the policy required affirmative proof of the decedent’s death, the one-year limitations period would not begin to run until the death was discovered. The Lukazewski Court utilized the doctrine of judicial tolling, which is not at issue in the present case, to suspend the running of the contractual limitations period. However, it is unclear why the contractual limitations period was considered at all, as the contract provision violated the law. 1917 PA 256 was enacted four years before the issuance of the life insurance policy. 1917 PA 256, part 3, ch 2, § 4, contains a provision that is substantively identical to our current MCL 500.4046(2), see n 29 of this opinion. Thus, because the policy required actual proof of death, the cause of action did not accrue until death could be proven. The plain language of the statute provided the plaintiff six years from the time the cause of action accrued to file suit.

 MCL 500.4046 states in pertinent part:
No policy of life insurance other than industrial life insurance shall be issued or delivered in this state if it contain [sic] any of the following provisions:
(2) A provision limiting the time within which any action at law or in equity may be commenced to less than 6 years after the cause of action shall accrue[.]

 New International Dictionary of the English Language (1954), p 1978.

 We note that Justice Kelly’s construction of this provision would render invalid any contractual limitations provision in an insurance contract, even one that paralleled the applicable statutory limitations period. Post at 502-503.

 In other contexts, the Legislature has explicitly assigned the responsibility of assessing the reasonableness of private contracts to the judiciary. See, for example, MCL 445.774a, which governs noncompetition covenants between an employer and an employee.

 Justice Kelly erroneously reads MCL 500.2236(5) as rendering the Commissioner’s review of a policy form discretionary. Post at 504-505. However, under that statutory subsection, the Commissioner’s discretion extends only to the ability to “disapprove, withdraw approval or prohibit the issuance” of a policy form.

 Certainly, if the Commissioner were to determine subsequently that the provision at issue unreasonably affected the risk assumed in the policy, MCL 500.2236(5) and (6) provide the appropriate mechanism for withdrawing approval of the policy condition.

 Justice Kelly charges that, in addressing the Herweyer adhesion contract issue, we are “engag[ing] injudicial activism”. Post at 512. This is a strange accusation given that both the trial court and the Court of Appeals relied on the adhesion contract principles announced in Herweyer as a basis for invalidating the contractual limitations provision at issue. We think it unremarkable for this Court to address an issue that all the lower courts addressed. Moreover, because it was Herweyer that literally ignored nearly a century of contrary precedent in adopting a new rule of contractual construction (see n 15 of this opinion), the claim of “judicial activism” would seem most accurately applied to the Herweyer majority.

 There are many descriptive labels that are used to categorize species of contracts: “unilateral,” see, e.g., Sniecinski v Blue Cross & Blue Shield of Michigan, 469 Mich 124, 138 n 9; 666 NW2d 186 (2003), "executory,” see, e.g., Kolton v Nassar, 358 Mich 154, 156; 99 NW2d 362 (1959), “installment,” Twichel v MIC Gen Ins Corp, 469 Mich 524, 532 n 5; 676 NW2d 616 (2004), etc. The fact that a particular label is attached to a contract does not exempt the contract from the application of standard contract law principles.

 Patterson, The delivery of a life-insurance policy, 33 Harv L R 198 (1919).

 Id. at 222.

 Id. at 221.

 Kessler, Contracts of adhesion — some thoughts about freedom of contract, 43 Colum L R 629 (1943). Kessler advocated that the “task of adjusting” contract law as it applied to adhesion contracts had to “be faced squarely and not indirectly.” Id, at 637.

 Id. at 632.

 Id. at 640.

 Id. at 641.

 Id. at 642.

 384 Mich 228; 180 NW2d 775 (1970).

 The policy contained an exclusion clause, indicating that the policy did not apply if insured vehicles were “used to carry property in any business.” Id. at 230. The policy also contained a provision indicating that the company would provide a defense for any lawsuit even if the suit was “groundless, false or fraudulent.” Id. at 231.

 Id. at 232.

 Id. at 232-233. The practice of interpreting contracts on the basis of reasonable expectations rather that the plain language of the contract was repudiated by this Court in Wilkie, supra at 63.

 Rombough, supra at 234.

 See also Klapp v United Ins Group Agency, Inc, 468 Mich 459; 663 NW2d 447 (2003) (discussing contra proferentem as a rule of legal effect, to be utilized only after all conventional means of contract interpretation have been applied).

 See, e.g., Twichel, supra at 535 n 6.

 Wilkie, supra at 55-56.

 384 Mich 646; 186 NW2d 335 (1971).

 Id. at 649.

 410 Mich 118; 301 NW2d 275 (1981).

 Id. at 142-143.

 412 Mich 355; 314 NW2d 440 (1982).

 Id. at 361-362 (emphasis added).

 Id. at 364.

 418 Mich 423; 344 NW2d 736 (1984).

 Former MCL 600.5040 et seq.

 Id. at 440 (citations omitted; emphasis added). Justices Kavanagh and Levin further determined that the arbitration agreement was not “unconscionable” because it was “not a long contract” and because arbitration was “the essential and singular nature of the agreement.” Id. at 441.

 Id. at 471-473 (citation omitted).

 Justice Williams concurred with Justice Kavanagh on the ground of constitutionality only, while Justice Cavanagh issued a dissent addressing only the constitutional issue. Justice Boyle did not participate in the resolution of the case.

 427 Mich 602; 398 NW2d 411 (1986), overruled by Wilkie, supra at 63.

 Id. at 608. Only Justice Archer joined Justice Williams’s opinion. Justices Brickley and Cavanagh concurred in the result only.

 See Wilkie, supra.

 433 Mich 208; 444 NW2d 803 (1989).

 Id. at 218.

 Id. at 215 n 7, noting the “judicial predisposition toward the insured,” and quoting 7 Williston, Contracts (3d ed), § 900, pp 19-20:
“The fundamental reason which explains this and other examples of judicial predisposition toward the insured is the deep-seated, often unconscious but justified feeling or belief that the powerful underwriter, having drafted its several types of insurance ‘contracts of adhesion’ with the aid of skillful and highly paid legal talent, from which no deviation desired by an applicant will be permitted, is almost certain to overreach the other party to the contract. The established underwriter is magnificently qualified to understand and protect its own selfish interests. In contrast, the applicant is a shorn lamb driven to accept whatever contract may be offered on a ‘take-it-or-leave-it’' basis if he wishes insurance protection.”

 455 Mich 14; 564 NW2d 857 (1997).

 Herweyer, supra at 20-21 (citation omitted).

 Id. at 21 (emphasis added).

 See n 15 of this opinion; see also Tom Thomas, supra at 592 n 4.

 Wilkie, supra at 60.

 See n 15 of this opinion.

 Herweyer, supra at 21.

 Wilkie, supra at 62.

 See n 23 of this opinion.

 Raska, supra at 362-363.

 Wilkie, supra at 63.

 In dissent, Justice Kelly opines that adhesion contracts should be viewed “with skepticism” because “[m]ost people simply do not have the opportunity, time, or special ability to read the policy before agreeing to it.” Post at 508, 509. However, an insured’s failure to read his or her insurance contract has never been considered a valid defense. This Court *490 has historically held an insured to have knowledge of the contents of the policy, in the absence of fraud, even though the insured did not read it. See Cleaver v Traders’ Ins Co, 65 Mich 527; 32 NW 660 (1887); Wierengo v American Fire Ins Co, 98 Mich 621; 57 NW 833 (1894); Snyder v Wolverine Mut Motor Ins Co, 231 Mich 692; 204 NW 706 (1925); Serbinoff v Wolverine Mut Motor Ins Co, 242 Mich 394; 218 NW 776 (1928); House v Billman, 340 Mich 621; 66 NW2d 213 (1954). Additionally, the Commissioner is precluded from approving an insurance policy that fails to obtain a prescribed “readability score” as set forth in MCL 500.2236(3).

 Justice Kelly believes that overruling Herweyer represents a “radical change of the law,” and that this Court should continue to “right the wrongs of adhesion contracts.” Post at 511. However, as.stated previously, the dissent overlooks the fact that Herweyer created a “radical change of the law” in Michigan.

 Justice Kelly suggests that there is never a meeting of the minds with a standardized form contract “[i]f the consumer does not read and comprehend the individual clauses of the contract....” Post at 508. If this is indeed the case, then no contract exists at all. See Quality Products, supra at 372 (“Where mutual assent does not exist, a contract does not exist.”) If the contract does not exist, there is nothing for a court to “revise.”

 We are at a loss to understand Justice Weaver’s dissent. Nothing in this opinion breaks new ground. Justice Weaver’s objection to the *491 proposition that án insurance contract he enforced in accordance with its plain terms, just as any other contract, is a proposition found in Raska, Wilkie, and Klapp, supra. We do not purport to address the laundry list of issues raised in her dissent.