*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

IGCFCO III, LLC,

Plaintiff-Appellee,

v

ONE WAY LOANS, LLC, doing business as
POWERLEND,

Defendant,

and

P&G HOLDINGS, LLC, WATERMARK
BANQUET AND CONFERENCE CENTER, LLC,
THE COFFEE FACTORY, LLC, and MOSES
GROSS,

Defendants-Appellants.

FOR PUBLICATION
August 8, 2024
9:05 a.m.

No. 366535
Muskegon Circuit Court
LC No. 2021-001755-CB

Before: RICK, P.J., and JANSEN and LETICA, JJ.

PER CURIAM.

Defendants, P&G Holdings, LLC, Watermark Banquet and Conference Center, LLC, the Coffee Factory, LLC, and Moses Gross, appeal as of right an order memorializing a final deficiency judgment against them and in favor of plaintiff, IGCFCO III, LLC. We affirm.

## I. FACTUAL BACKGROUND

Defendant Gross is the owner of P&G, a holding company that in turn owned several parcels of real property, including the Watermark Banquet and Conference Center, LLC, and the Coffee Factory, LLC. In March 2019, plaintiff gave defendants P & G and One Way Loans, LLC, doing business as Powerlend, a loan of $6,575,000. P & G put forth several of its properties, including Watermark and the Coffee Factory, as collateral for the loan. Additionally, to obtain the

-1-

loan, defendants signed a security agreement, a promissory note, a credit agreement, a mortgage, and an assignment of all future leases, rents, and profits from the properties in favor of plaintiff.

Defendants defaulted on the loan in early 2021. In May 2021, plaintiff estimated that it was owed $9,183,920. On May 4, 2021, plaintiff filed a complaint against defendants, alleging one count of breach of contract against Powerlend and P&G as the borrowers on the loan and one count of breach of contract against Watermark, the Coffee Factory, and Gross as guarantors on the loan (Counts I and II). Plaintiff further alleged that it was entitled to judicial foreclosure (Count III) and requested that the trial court appoint a receiver for the property (Count IV). Defendants, excluding Powerlend,[1] answered plaintiff's complaint in June 2021 and generally denied liability.

In January 2022, plaintiff filed a motion for entry of a consent judgment. The motion stated that the parties entered into a settlement agreement that resolved all of the pending claims. According to the settlement agreement, defendants were required to remit $8.4 million to plaintiff by January 7, 2022. "[I]f Defendants failed to make the required payments," plaintiff explained, "the Consent Judgment, which was executed as part of the Settlement Agreement would be released from escrow and filed with this Court." Defendants paid plaintiff $100,000, but defaulted on the remaining $8.3 million due as part of the agreement. Consequently, plaintiff requested that a default judgment for the remaining balance be entered by the court.

Plaintiff filed an amended motion to enter a consent judgment in February 2022. Plaintiff explained that on February 4, 2022, the parties signed an amended settlement agreement, under which defendants were required to pay $175,000 to plaintiff and sign a new proposed consent judgment. Defendants failed to uphold the terms of the amended settlement agreement; thus, plaintiff asked the trial court to enter the revised consent judgment. The revised consent judgment called for the court to enter a judgment in plaintiff's favor in the amount of "$9,650,000 minus any amounts properly paid by Defendants" and awarding plaintiff the right to take possession of the subject properties. The parties signed the consent judgment, and it was ultimately entered in March 2022.

In May 2022, plaintiff filed a motion to enforce the consent judgment. Plaintiff explained that as part of the terms of the judgment, defendants were supposed to remit a number of security deposits to plaintiff that corresponded to various rental agreements in an apartment complex on the Watermark property. Despite repeated demands, defendants had failed to do so. Plaintiff asked the trial court to grant its motion and order defendants to turn over all of the outstanding security

---

[1] The record indicates that in August 2021, plaintiff attempted to procure some kind of response from Powerlend, going so far as to file a motion for a second summons and notice to appear. Attached as appendices to the motion were several notarized affidavits of nonservice listing the known addresses for Powerlend's offices and the dates that a process server attempted to contact Powerlend. An order granting the motion was subsequently entered. Powerlend never responded. It is unclear from the record whether the trial court entered a default against Powerlend or took some alternative action following the company's complete failure to respond. Suffice it to say, however, that Powerlend does not participate in this appeal.

deposits. On June 1, 2022, defendants filed a response to the motion to enforce the consent judgment, stating that they would agree to turn over the security deposits if plaintiff would identify the tenants who were allegedly moving out of the apartment complex. On June 9, 2022, the trial court entered an order granting the motion to enforce the consent judgment.

On June 21, 2022, plaintiff filed a motion to show cause, explaining that defendants had failed to comply with the court's order enforcing the consent judgment, and asking the court to hold defendants in contempt. On July 11, 2022, the court entered an order stating that "the Plaintiff may submit an order directing each defendant to provide a representative to show cause at a court hearing why an order of contempt with sanctions should not be entered." The order was submitted by plaintiff and signed by the trial court on July 19, 2022. A show-cause hearing was held in August 2022. Plaintiff's counsel indicated that part of the reason the security deposits had not been turned over was due to defendant Gross failing to maintain a separate account for tenant security deposits in violation of state law. Gross agreed that he had failed to do so and stated at the hearing that he simply did not have the money to pay plaintiff the security deposits. The court noted that it sympathized with Gross's situation but still found it troubling that he had "basically absconded with security deposits[,]" and elected to hold defendants in contempt. On September 2, 2022, the trial court entered an order granting the motion to show cause and ordering defendants to pay plaintiff $27,377 in security deposits, along with $1,000 for attorney fees, within 30 days.

On September 27, 2022, plaintiff again filed a motion to show cause, noting that defendants still had not turned over the security payments and asking that they be held in contempt. A hearing on the motion was held in December 2022. The court held defendants in contempt once again, and an order was subsequently entered directing defendants to pay plaintiff $28,377 in security deposits and $1,623 in attorney fees.

In April 2023, plaintiff filed a motion for entry of a deficiency judgment. The motion stated that defendants still had not paid the money owed as directed by the court in its December 2022 order granting plaintiff's show-cause motion. Additionally, plaintiff explained that the property had been sold on December 22, 2022, for $5,275,000, which resulted in a net profit to plaintiff of $4,892,187. According to plaintiff, "[i]nterest on the Judgment Amount from the date of the Consent Judgment to the filing of this motion at the rate of thirteen percent (13%) per annum totals $500,000.00." Plaintiff submitted an affidavit from Jeff Padden, plaintiff's general counsel, in support of this figure. The proceeds of the sale, along with the $30,000 debt and the $500,000 in unpaid interest created a deficiency of $5,287,812, which plaintiffs claimed defendants were required to pay to satisfy the consent judgment.

Defendants responded to plaintiff's motion on May 23, 2023. Defendants argued that plaintiff was not entitled to a final deficiency judgment because it had not established that the sale of the property was commercially reasonable under Article 9 of the Uniform Commercial Code (UCC), MCL 440.9101 *et seq*. Defendants contended that plaintiff intentionally sold the property for a price far below market value and far below the asking price of $7,990,000. Defendants argued that plaintiff was only entitled to a deficiency judgment if the outstanding debt exceeded "the fair market price for the Watermark Properties plus any other rent and other recoveries already collected by plaintiff." Defendants further contended that the amount of any judgment awarded plaintiff had to be reduced by the amount of any rents or recoveries received after plaintiff took possession of the property, and asked that the court allow limited discovery into these issues.

Along with the motion, defendants submitted a lengthy list of exhibits discussing the property and information about property market values, as well as an unsworn and unnotarized copy of an affidavit from Moses Gross.

Plaintiff replied on May 25, 2023. Plaintiff argued that it sold the property in a commercially reasonable manner, using Coldwell Banker Richard Ellis (CBRE) as their real estate broker. CBRE engaged with AMN Group to list the property with a number of commercial real estate listing companies, and relisted the property once the original posting expired. When the property was relisted, plaintiff alleged that CBRE sent out more than 54,000 advertising e-mails. Plaintiff further stated that in late May 2022, CBRE received an offer on the property for $5.2 million, and made a higher counteroffer that was rejected by the prospective buyer. Ultimately, a collective of companies—Shaw Walker Opportunity Zone Business 1, LLC, Shaw Walker Opportunity Zone Business 2, LLC, Shaw Walker Opportunity Zone Business 3, LLC, and Shaw Walker Opportunity Zone Business 4, LLC (collectively "Shaw Walker")—offered to buy the property for $5,275,000. Plaintiff accepted the offer. According to plaintiff, "The offer to purchase by Shaw Walker of $5,275,000.00 was the best offer received for the purchase of the Property. CBRE and Plaintiff used their best efforts to secure the best price for the sale of the Property."

Plaintiff additionally argued that the deficiency judgment should not be reduced by the amount of rent received after it took possession of the property, noting that there was not an industrial tenant renting the property from April through December 2022, causing a net loss of $500,000 in income to plaintiff. Plaintiff thus asked the court to enter the deficiency judgment as requested. Along with the response, plaintiff submitted an affidavit from James Barrons, senior counsel for Balbec Capital, LP, a private equity firm that handled financial business for plaintiff. Barrons attested to the amount of money plaintiff earned and lost after taking possession of the property in March 2022. Barrons further detailed the steps that plaintiff took to engage CBRE as a real estate broker and to sell the property, which largely mirrored plaintiff's explanation of its efforts to sell the property.

The trial court held a hearing on the deficiency judgment on May 26, 2023. Defendants pointed out that it appeared that plaintiff sold the property quickly before the end of the year for tax reasons, and argued that plaintiff therefore did not sell the property in a commercially reasonable manner. Defendants also argued that plaintiff's accounting of what was owed in the deficiency judgment was flawed. Plaintiff responded that the deficiency judgment amount was correctly calculated and that the property was sold in a commercially reasonable manner. The trial court ultimately agreed that plaintiff had presented sufficient evidence to support entering a deficiency judgment. It explained:

> [T]he defendants in their response brief have attached exhibits. A couple of them are evaluations or assessments or appraisals of the property indicating a 7.9-million-dollar value and a 12-million-dollar value. There's also an unsigned affidavit by Defendant Moses Gross.
>
> The plaintiffs have replied, filed a reply brief within an affidavit by . . . James Barrens [sic] that had several exhibits to it. They argue that they have listed the property with CBRE for 7.9 million in May of 2022. They were unable to get

-4-

any offers until the 5.2 [million] from Shaw-Walker Group, who ultimately, I believe, purchased the property here. The Court would note that defendant was trying to sell the property prior to the entry of the deficiency or the consent judgement [sic]. The Court is going to apply or give significant weight to the James Barrens' [sic] affidavit. It seems to have laid out fairly extensively all the steps that were taken that laid out the method, the manner, the time, the place, and the terms used to market the property.

So, the Court does find that the plaintiff complied with the requirements using commercially reasonable means to sell the property, and that an extended discovery period which plaintiff has requested would be futile. That the sale price of 2 point—of 5.275 million would be a fair market value . . . .

With regards to the issue as to the offset, with regards to the rent, there's been really insufficient evidence presented by defendant that this is actually even part of the contemplated deficiency judgment. The Court is somewhat limited to the consent judgement [sic] of March 9th, 2022, so it's not going to take it into consideration. And even if it did, I think that there's been sufficient evidence presented in the—the affidavits presented by the—by both the initial brief and the reply brief of the plaintiff that the there was no probably [sic] profit earned during the time period of possession by the plaintiff.

A final deficiency judgment was entered on May 26, 2023. The trial court ordered defendants to pay plaintiff $5,287,812 with an interest rate of 13%, with total interest to be capped at $500,000. This appeal followed.

## II. ANALYSIS

Defendants argue that the trial court abused its discretion by declining to grant an evidentiary hearing on the subject of commercial reasonableness under Article 9 of the UCC. They further contend that the court erred by concluding that the properties were sold in a commercially reasonable manner and that any rents received by plaintiff did not need to be factored into the calculation of the deficiency judgment. We disagree.

## A. STANDARD OF REVIEW

This Court reviews for an abuse of discretion a trial court's decision that an evidentiary hearing is not warranted. *Estate of Carlsen v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 701; 980 NW2d 785 (2021). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Id*. at 693 (quotation marks and citation omitted). To the extent that this issue concerns questions of law, including whether the sale of the property was commercially reasonable under Article 9 of the UCC and whether rents received are factored into the calculation of a deficiency judgment, the Court's review is de novo. *In re Moukalled Estate*, 269 Mich App 708, 713; 714 NW2d 400 (2006).

## B. COMMERCIALLY REASONABLE SALE

Defendants first take issue with the court's decision not to hold an evidentiary hearing in this matter and its conclusion that the sale of the property was commercially reasonable under Article 9 of the UCC. On appeal, plaintiff challenges the application of Article 9, claiming that the consent judgment in this matter controls. We agree with plaintiff that Article 9 does not apply to this case. Article 9 was specifically intended to create a security interest in personal property and fixtures on the land; it generally does not apply to transactions in which the collateral at issue is real property, as is the case here. See MCL 440.9109(4)(k); *In re Estate of Moukalled*, 269 Mich App 708, 716; 714 NW2d 400 (1998) (stating that "[A]rticle 9 does not apply to the creation or transfer of an interest in land."); see also *Berry v Main Street Bank*, 977 F Supp 2d 766, 733 (ED Mich, 2013) (recognizing that other federal courts have held that the UCC does not apply to mortgage foreclosures, the court dismissed the plaintiff's claims under Article 9 because it applies to personal property rather than real property).

We therefore agree with plaintiff that the consent judgment controls. According to the terms of the consent judgment signed by the parties, the property was required to be sold in "any commercially reasonable manner and means that [plaintiff] (or its designee) decides to use." This Court has held that "[a] consent judgment is in the nature of a contract, and is to be construed and applied as such." *Laffin v Laffin*, 280 Mich App 513, 517; 760 NW2d 738 (2008). In determining the meaning of a contract, this Court "give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005). If the terms are ambiguous or undefined, this Court may use dictionary definitions to ascertain their plain and ordinary meaning. *Auto-Owners Ins Co v Seils*, 310 Mich App 132, 145; 871 NW2d 530 (2015). The consent judgment does not define the term "commercially reasonable;" however, with regard to the sale of real property, the term generally means that the sale was "conducted in good faith and in accordance with commonly accepted commercial practice." *Black's Law Dictionary* (11th ed).

Upon review of the record, we conclude that plaintiff's proof that the sale was commercially reasonable was sufficient to support the trial court's decision to enter the deficiency judgment. In support of its original motion for entry of a deficiency judgment, plaintiff attached an affidavit from its general counsel, Jeff Padden, regarding the sale of the property, as well as a copy of a proposed deficiency judgment. Padden's affidavit states that the net proceeds of the sale of the property amounted to $4,892,187. Plaintiff was additionally permitted by the trial court to file a reply to defendants' response to the motion. As evidence that the sale was commercially reasonable, plaintiff submitted two show-cause orders previously entered by the court and Barrons's affidavit. Attached to the affidavit is a series of documents from CBRE describing the listing and indicating that the property was placed on the market for $7.9 million. The affidavit explains that plaintiff engaged CBRE, a highly esteemed real estate broker, to handle the sale. The property was previously listed with Core Realty for $12 million, but failed to sell at that price, so the parties agreed to a list price of $7.9 million.

The affidavit goes on to explain that CBRE engaged in an intensive marketing campaign in an effort to sell the property, but could not find a buyer interested in paying the $7.9 million list price. According to Barrons, prospective buyers declined to purchase the property for the list price for a multitude of reasons. He explained:

> In CBRE's opinion and experience, the factors leading to a lower price during the engagement with AMN[] included, among other things, the size of the Property, the mixed zoning, the vacancies, the costs of the necessary renovations (roughly 500,000 square feet of raw and aging industrial space which needed to be renovated/demolished), and the weak demographics and slow growth of the Muskegon market.

CBRE received an offer for $5.2 million and attempted to counteroffer with a higher sale price, but the prospective buyer would not budge on the price. Ultimately, plaintiff agreed to sell the property to Shaw Walker for $5,275,000.

Plaintiff's evidence shows that the property was placed on the market for $7.9 million by agreement between the parties, and indicates that the property failed to sell at a higher price. CBRE clearly attempted to get the best price possible, but there was simply no strong interest in the property given the amount of work that would have to be done on it in terms of renovation and demolition. Plaintiff provided objective proof that the sale was made in accordance with commonly accepted commercial practice and conducted in good faith.

Defendants acknowledge that whether to hold an evidentiary hearing is an exercise of the trial court's discretion, see *Williams v Williams*, 214 Mich App 391, 399; 542 NW2d 892 (1995), but nevertheless claim that an evidentiary hearing was necessary here because the trial court ruled on the deficiency judgment solely on the basis of Barrons's affidavit. Defendants explain that the court should not have assessed the affidavit's credibility or based its decision to grant the deficiency judgment on the affidavit alone. They additionally cite a number of cases addressing a trial court's assessment of the credibility of affidavits at the summary disposition stage. See, e.g., *SSC Assoc Ltd Partnership v Gen Retirement Sys of City of Detroit*, 192 Mich App 360, 364-365; 480 NW2d 275 (1991) (standing for the proposition that "where the truth of a material factual assertion of a moving party's affidavit depends on the affiant's credibility, there exists a genuine issue to be decided at trial by the trier of fact."). Defendants acknowledge that the matter at hand was not decided in a motion for summary disposition, but argue that the same rules should generally apply.

Defendants present no authority to directly support the argument that they are entitled to an evidentiary hearing here. Absent any compelling legal authority, we thus conclude that the trial court did not abuse its discretion when it determined an evidentiary hearing was unnecessary. The trial court need not hold an evidentiary hearing if it can sufficiently decide an issue on the basis of evidence already presented. *Vittiglio v Vittiglio*, 297 Mich App 391, 406; 824 NW2d 591 (2012).[2]

---

[2] We further note that defendants did not present evidence that might have convinced the trial court that an evidentiary hearing was required. In support of their responsive brief, defendants submitted two exhibits concerning the property—one news article about the sale and one set of documents describing the property—and an unsworn, unnotarized affidavit from Gross. The news article and the property description do little to support the argument that the sale of the property was not commercially reasonable. Moreover, courts require affidavits to be sworn and notarized in order to be valid. *Holmes v Mich Capital Med Ctr*, 242 Mich App 703, 711; 620 NW2d 319 (2000).

Plaintiff's evidence was sufficient to show that the sale was commercially reasonable for the reasons stated; thus, defendants are not entitled to relief.

## C. OFFSET OF DEFICIENCY JUDGMENT

Defendants also argue that the deficiency judgment should have been offset by the amount of rents and income received by plaintiff after plaintiff took possession of the property, and contend that the trial court erred by requiring them to establish that the offset should have been permitted. We find this argument unpersuasive. Defendants are not entitled to relief because they have not shown that they are entitled to an offset of the deficiency based on rents received by plaintiff.

While ruling on the motion for entry of a deficiency judgment, the trial court stated that "with regards to the rent, there's been really insufficient evidence presented by defendant that this is actually even part of the contemplated deficiency judgment." It further stated that "there's been sufficient evidence presented in the . . . affidavits . . . that the there was no probably [sic] profit earned during the time period of possession by the plaintiff." Defendants claim that the trial court erroneously shifted the evidentiary burden by stating that they presented insufficient evidence to show they were entitled to the offset. In support of their argument, defendants cite MCL 440.9626(b), which states that in a deficiency action, the secured party bears the "burden of establishing that the collection, enforcement, disposition, or acceptance was conducted" in accordance with Article 9 of the UCC.

We again note that Article 9 of the UCC does not apply to this case. See MCL 440.9109(4)(k) ("This article does not apply to . . . [t]he creation or transfer of an interest in or lien on real property[.]"). To prevail, defendants must instead demonstrate that the language of the consent judgment entitles them to an offset of the deficiency judgment. See *Laffin*, 280 Mich at 517. However, nowhere in the consent judgment signed by the parties is it stated that defendants are entitled to an offset of the deficiency judgment. The trial court thus did not err by finding that the deficiency judgment should not be offset based on rents received by plaintiff, and reversal is not required.

Affirmed.

/s/ Michelle M. Rick
/s/ Kathleen Jansen

---

After the trial court noted in its ruling that Gross's affidavit was unsigned, defendants sought clarification, stating that they had filed a signed affidavit. The trial court responded, "whether it was signed or unsigned, [it was] not going to change [its] ruling. . . ." We agree.