*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TROPICS, LP,

        Plaintiff-Appellee,

v

GREEN PEAK INDUSTRIES, INC., DISTRICT BAY, LLC, THE DISTRICT PARK, LLC, and GPIMD CORP,

        Defendants-Appellees,

and

3FIFTEEN PARTIES,

        Intervening Respondent,

and

GENE R. KOHUT, Receiver,

        Appellee,

and

KOACH GR II, LLC, and KOACH YPSILANTI I, LLC,

        Appellants.

FOR PUBLICATION
August 26, 2025
2:41 PM

Nos. 368240; 368282
Ingham Circuit Court
LC No. 23-000149-CB

---

TROPICS, LP,

        Plaintiff-Appellee,

v

Nos. 368446; 368461
Ingham Circuit Court

-1-

GREEN PEAK INDUSTRIES, INC., DISTRICT BAY, LLC, THE DISTRICT PARK, LLC, and GPIMD CORP,

LC No.   23-000149-CB

Defendants-Appellees,

and

3FIFTEEN PARTIES,

Intervening Respondent-Appellant,

and

GENE R. KOHUT, Receiver,

Appellee,

and

KOACH GR II, LLC, and KOACH YPSILANTI I, LLC,

Intervenors.

Before:  BOONSTRA, P.J., and LETICA and RICK, JJ.

RICK, J.

This appeal presents novel issues regarding the general powers of receivers under the Michigan Receivership Act (MRA), MCL 554.1011 *et seq.*  We are tasked with discerning the application of the MRA to a marijuana business.  Strictly speaking, the United States is a patchwork when it comes to the legal status of marijuana.[1]  Marijuana remains classified as a Schedule I drug at the federal level.  21 USC 812.[2]  On the state level, marijuana remains completely criminalized in some states, while others, including Michigan, have legalized its use

---

[1] This Court has repeatedly observed that the spelling "marihuana" prevails in the legislative context, but that "marijuana" otherwise prevails in judicial opinions.  See, e.g., *Yellow Tail Ventures, Inc v Berkley*, 344 Mich App 689, 694; 1 NW3d 860 (2022).

[2] Substances that are classified as schedule I are considered to have a high potential for abuse and no potential for medical use.  They are deemed unsafe, even with medical supervision.  See 21 USC 812.

for medical and recreational purposes.[3]  Resultantly, under the United States Bankruptcy Code, 11 USC 101 *et seq*., a marijuana business may not declare bankruptcy.  This appeal concerns the receivership of defendants, Green Peak Industries, Inc. (GPI), District Bay, LLC, The District Park, LLC, and GPIMD Corp (collectively known as Skymint).  Plaintiff, Tropics, LP, sought the receivership as a creditor of Skymint.

In Docket No. 368240, appellants, Koach GR II, LLC, and Koach Ypsilanti I, LLC (collectively known as Koach), appeal by leave granted[4] an order granting the motion of receiver Gene R. Kohut to reject the Ypsilanti lease between Skymint and Koach, and prohibiting Koach from declaring a breach or default on a separate lease in Grand Rapids, despite the existence of cross-default provisions in the leases.  In Docket No. 368282, Koach appeals by leave granted[5] the trial court's order approving the sale of the receivership property and assigning contracts to a stalking horse bidder—in this case, Skymint Acquisitions Co., a designee of Tropics.  Intervening respondent-appellant 3Fifteen Parties[6] (3Fifteen) appeals by leave granted[7] the same order in Docket No. 368446.  Finally, in Docket No. 368461, 3Fifteen appeals by delayed leave granted[8] the trial court's September 27, 2023 order granting the receiver's motion to reject some of 3Fifteen's leases.  We affirm in part, reverse in part, and remand to the trial court.

## I. FACTUAL BACKGROUND

District Bay, LLC, The District Park, LLC, and GPIMD Corp are subsidiaries of GPI.  GPI and its subsidiaries collectively do business as "Skymint."  3Fifteen is the trade name of Green Skies—Healing Tree, LLC (Healing Tree), Green Skies—Far West, LLC (Far West), Battle Spring, LLC, Ann Arbor Healing, LLC, Warren Capital Holdings, LLC, Miny Holdings, LLC, and Meridia Capital Partners IV.  In 2021, GPI arranged to purchase the assets of 3Fifteen.

In April 2021, Koach GR II, LLC, and Healing Tree entered into a lease for a parcel of property in Grand Rapids.  Relevant to this appeal, the lease contained specific terms regarding assignment, including the conditions under which the lease could be assigned without Koach's

---

[3] National Conference of State Legislatures, *Cannabis Overview* <https://www.ncsl.org/civil-and-criminal-justice/cannabis-overview> (accessed August 21, 2025).

[4] *Tropics LP v Green Peak Indus, Inc*, unpublished order of the Court of Appeals, entered November 29, 2023 (Docket No. 368240).

[5] *Tropics LP v Green Peak Indus, Inc*, unpublished order of the Court of Appeals, entered November 29, 2023 (Docket No. 368282).

[6] 3Fifteen is the trade name of Green Skies—Healing Tree, LLC, Green Skies—Far West, LLC, Battle Spring, LLC, Ann Arbor Healing, LLC, Warren Capital Holdings, LLC, Miny Holdings, LLC, and Meridia Capital Partners IV.

[7] *Tropics LP v Green Peak Indus, Inc*, unpublished order of the Court of Appeals, entered November 29, 2023 (Docket No. 368446).

[8] *Tropics LP v Green Peak Indus, Inc*, unpublished order of the Court of Appeals, entered November 29, 2023 (Docket No. 368461).

permission. It also included provisions regarding what constituted a default, including a cross-default provision, which indicated that default under the Grand Rapids lease constituted a default under all other leases between the parties.

In or around April 2022, a lease was also entered into between The District Park and an "FL MI" subsidiary of 3Fifteen. The term of the lease was not defined, but the lease was subject to The District Park obtaining a state license to operate a marijuana facility. The lease provided the exact same language as Koach's Grand Rapids assignment of the lease. It also contained a cross-default provision indicating that a default existed under the lease if "[a] Default pursuant to Section 20.4.2 or Section 20.4.12 exists under the terms of any Other Lease." The lease defined "other lease" as "excluding this Lease, any lease agreement entered into by and between the Tenant or its affiliates and the Landlord or its affiliates[.]"

In September 2021, Tropics loaned $70 million to GPI. The loan was memorialized by a securities purchase agreement (SPA) and a secured note for principal and interest. As part of the SPA, Skymint agreed to deliver to Tropics a financial statement within 120 days of the end of each fiscal year and to maintain a minimum cash balance of $7.5 million. Under the parties' secured note, in the event of a default, Tropics was permitted to declare the note due and payable immediately. The note was secured by a first-priority security interest in all of Skymint's assets. Skymint agreed that Tropics was entitled to the appointment of a receiver in the event of a default. In March 2022, Skymint defaulted by failing to maintain a minimum cash balance or provide a financing statement within 120 days of December 31, 2021. In May 2022, Tropics and Skymint agreed that there was a default under the SPA on these bases. Tropics provided a "Loan Increase" of $5 million, and Skymint agreed that, as of April 30, 2022, the balance due on the parties' note was $81,482,865.36.

In June 2022, Tropics informed Skymint that a new default existed because Skymint had failed to meet its minimum liquidity requirements and had not raised $15 million in new capital. In a second amendment dated November 14, 2022, Skymint agreed that it owed $94,838,436.15, at which point Tropics advanced an additional $6.25 million to Skymint. The proceeds were to be used "in accordance with Section 6 of the Forbearance Agreement." That agreement provided that Skymint had requested that Tropics forbear from exercising its default-related rights. At that time, $6,250,000 was due for taxes and various fees. Tropics alleged that about $5.8 million of the advance was used to pay overdue sales and excise taxes, which was consistent with the amounts due.

In November 2022, Koach Ypsilanti I, LLC, and GPI entered into a lease for property in Ypsilanti. As part of the lease, the tenant was to construct improvements to the premises at Koach's cost, not to exceed $386,920.73. The terms regarding assignment and subletting were identical with the Grand Rapids lease, with the following exception:

> 16.3.1. Tenant shall remain fully liable under this Lease, including with respect to the Term after the Transfer Date. Tenant agrees that it shall not be (and shall not be deemed to be) a guarantor or surety of this Lease, however, and waives its right to claim that it is a guarantor or surety or to raise in any legal proceeding any guarantor or surety defenses permitted by this Lease or by Applicable Laws[.]

Additionally, the terms regarding default were identical with the Grand Rapids lease, with the following exceptions:

> 20.4.13. Tenant is not open for business at the Premises to the public as a fully licensed cannabis adult use retailer on or before November 18, 2023.
>
> 20.4.14. A Default pursuant to Section 20.4.2 or Section 20.4.12 exists under the terms of any Other Lease. "Other Lease" means, excluding this Lease, any lease agreement entered into by and between the Tenant or its affiliates and the Landlord or its affiliates[.]

In January 2023, Skymint's forbearance period expired. Tropics informed Skymint of this fact in March 2023, and demanded repayment of the outstanding balance of $127,037,817.92. Tropics also demanded that Skymint make its collateral available. That same month, Tropics filed a complaint against GPI, District Bay, LLC, The District Park, LLC, and GPIMD Corp. Tropics stated claims for breach of the SPA, the promissory note, and the guaranty and security agreement. Tropics stated a claim for "claim and delivery," seeking immediate possession of the collateral securing the guaranty and security agreement.

Tropics sought a receiver on the basis of the size, scope, and regulated nature of Skymint, as well as concerns about an imminent threat of waste to Tropics's collateral. Tropics alleged that Skymint lacked sufficient cash to operate its business and that Skymint owed more than $3.9 million in sales and excise taxes. The landlord of Skymint's cultivation facility had filed a complaint to evict Skymint, which owed more than $1 million in rent. Tropics also asserted that Skymint's business had been hampered by its attempt to purchase 3Fifteen. Tropics alleged that Skymint had pledged substantially all of its assets as security for the sums that it owed to Tropics and that Skymint had agreed to the appointment of a receiver in the event of a default under the parties' contract. Tropics asserted that, "[u]nless a Receiver is appointed to take possession of and preserve the assets of [Skymint], [Tropics's] interest in those assets will continue to diminish."

The court found good cause to appoint a receiver. Skymint and Tropics stipulated to the appointment of Gene Kohut as receiver. In pertinent part, the receivership property was to include "leases" and "contracts." The court ordered that "[t]he Receiver is authorized to take any action the Receiver deems reasonable and appropriate to manage and operate the Receivership Property and to attempt to market and sell the Receivership Property, and otherwise to exercise the power and authority set forth in this Order." The court granted the receiver the power to "enforce or terminate any existing contracts affecting the Receivership Property[.]" The order also provided that, "[u]pon Plaintiff's prior written consent, the Receiver or its designee may amend, modify, terminate or enter into new leases with respect to the Receivership Property or enter into or authorize the renewal or expansion of existing leases[.]" The court also granted the receiver the power to

> comply with, terminate, re-negotiate or abrogate any or all agreements, contracts, understandings or commitments entered into by any Defendant or its agents with respect to the Receivership Property to the extent permitted by applicable law, with no further obligation or liability, including the liability to pay any termination fee under such terminated contract[.]

In May 2023, the receiver moved the court to approve bidding procedures for the sale of the receivership property. The receiver had determined that it was in the best interest of the receivership estate and its creditors to sell the receivership property. The receiver sought permission to conduct an auction sale or, in the event there were no overbids, to sell the assets "free and clear of all liens and encumbrances to an entity to be formed by Tropics (the 'stalking horse bidder')."[9] The receiver opined that "the sale of the Acquired Assets to the Stalking Horse Bidder is in the best interests of the receivership estate and will maximize recovery to the receivership estate." The stalking horse bidder would provide a credit bid of about $109,400,000, and agreed to assume all pre- and post-receivership obligations, administrative expenses, and costs for cure related to contracts and leases. The motion proposed definitions and procedures should another qualified bidder desire to bid on the property. The receiver attached a notice of cure to the motion, which advised interested parties that the receiver was seeking to conduct an auction of substantially all of Skymint's assets and that the successful bidder might assume one or more contracts or leases.

The trial court determined that the receiver had articulated sufficient reasons to grant the requested relief. It thus allowed the stalking horse bidder to credit bid, and it approved the bidding procedures stated in the motion. The court found that entry of the order "is in the best interests of [Skymint] and their respective estates and creditors, and all other parties in interest."

Ultimately, the receiver averred that he had marketed Skymint's assets by sending a notice of sale to about 50 interested parties and posting the sale in a business paper and cannabis-venture newsletter. He had received several inquiries and entertained all offers. Five nondisclosure agreements were executed, but despite numerous conferences, the receiver was unable to secure any qualified bids higher than that of the stalking horse bidder. The stalking horse bidder had informed the receiver that some assets would not be purchased and assumed. The receiver, in his business judgment, believed that the stalking horse bidder's offer to purchase substantially all of the receivership property would maximize the value of the receivership estate.

In July 2023, Koach objected to the receiver's notice of cure and assignment. Koach indicated that it acquires commercial real estate related to regulated cannabis operators, provides those operators with funds for capital expenditures, then "capitalizes its acquisition and tenant improvement expenses into long term leases with said operators." In the cannabis industry, "these arrangements are commonly referred to as 'sale-leasebacks.'" The real estate was acquired at a "cannabis premium," which was higher than the real estate's value outside of the cannabis

---

[9] A stalking horse bidder is an entity that makes an initial bid on the assets of a bankrupt company. Will Kenton, *Stalking Horse Bid: Definition, How It Works, and Example* < https://www.investopedia.com/terms/s/stalkinghorsebid.asp> (accessed August 21, 2025). "With a stalking horse agreement, the seller is able to demonstrate that there is interest in the assets and establish a minimum value for them." 1 Strategic Alternatives For and Against Distressed Businesses Practice Manual (Westlaw, January 2025 update), § 18:8 (footnote omitted). The stalking horse bidder in this matter was ultimately identified as Skymint Acquisition Co.

business, and the economic assumption underlying the transaction was that the real estate would remain capable of being operated as a cannabis facility.

Koach additionally indicated that "the Receiver and Stalking Horse Bidder may ultimately seek to assign the Grand Rapids Lease while rejecting the Ypsilanti Lease." Koach argued that cross-default provisions in the leases required the receiver to assign both leases, noting that if the receiver rejected the Ypsilanti lease, a default would be triggered under the Grand Rapids lease. Koach would then have the right to terminate the Grand Rapids lease and evict the tenant. Koach explained that this was so "because nothing in the Executory Contracts Section, or any other section of the Receivership Act, authorizes the Receiver to alter, modify or reform the Grand Rapids Lease to remove the cross-default provision." Therefore, Koach argued that the court should not allow the receiver to assign only the Grand Rapids lease.

Koach also argued that the receiver was required to comply with the antiassignment provisions in the leases. Although the leases could be assigned without Koach's consent in some circumstances, those contractual terms required that information be provided to Koach, and the receiver had not provided any information regarding the stalking horse bidder or other potential bidders. Koach asserted that the receiver was not authorized to assign the leases unless the information was provided.

3Fifteen also objected to the assumption of its leases. 3Fifteen argued that, according to the provisions of each lease, a default under any lease was a default under all the leases. Further, the leases could not be assigned without 3Fifteen's consent. 3Fifteen asserted that Skymint's right to assign the leases was subject to a term of the lease, and 3Fifteen had not been provided with any information about the proposed assignee, including the name of the tenant, the identity of its managers and officers, or its financial status.

In September 2023, the receiver moved to reject some of 3Fifteen's leases. The receiver noted that the lease agreements provided that default under one lease constituted default under the terms of any other lease between Skymint and 3Fifteen. The receiver indicated that he had worked with Tropics "to determine which of Skymint's executory contracts and unexpired leases will provide value to the Stalking Horse Bidder's business operations going forward." The stalking horse bidder did not want to assume leases between Skymint and subsidiaries of 3Fifteen for certain locations in Detroit, Hamtramck, and Grand Rapids. The receiver opined that, because the costs of operation for the rejected leases outweighed any potential benefits, it was in the best interests of the receivership to reject the leases.

The receiver argued that he could reject the disputed leases under his authority to terminate existing contracts. He argued that the cross-default provisions in the leases conflicted with the receiver's contract-rejection rights under the MRA. Further, the receiver contended that "cross-default provisions are not enforceable in the context of equity receiverships." The receiver argued that he was permitted to reject contracts without triggering liabilities associated with that rejection. Provisions concerning the forfeiture, modification, or financial condition did not affect the receiver's power to adopt a contract. Further, the receiver argued that enforcing the cross-default provisions would deprive him of the ability to exercise authority under the MRA and render the clauses "akin to impermissible ipso facto clauses[.]"

The receiver additionally contended that the MRA provided the receiver with powers similar to those of bankruptcy trustees and that the analysis of cross-default provisions under bankruptcy law should be applied to receiverships. Various federal bankruptcy decisions disregarded cross-default provisions because they impermissibly restricted the receiver's authority of assumption and assignment and frustrated the debtor's ability to rehabilitate the business by assuming profitable portions of the business. Bankruptcy trustees were entitled to reject leases independently. According to the receiver, the same logic applied in the context of receiverships. The parties did not intend the leases to be integrated. Ultimately, the receiver requested that the court authorize the rejection of some of the 3Fifteen leases and determine that the rejection would not affect the validity of other leases.

The receiver's motion to reject the Ypsilanti lease between Skymint and Koach was substantially the same. However, the receiver additionally argued that the Ypsilanti location had never been operational and that it would be detrimental for the receivership estate to be forced to carry the costs of the Ypsilanti lease for the benefit of the Grand Rapids lease. Ultimately, the receiver requested that the court determine that the cross-default provisions were unenforceable and authorize the receiver to assign the Grand Rapids lease and reject the Ypsilanti lease.

Regarding Koach's objections to the assignment of the leases, the receiver responded that the leases provided that Skymint was authorized to assign the leases to the stalking horse bidder without Koach's consent. The receiver argued that Skymint had satisfied or would satisfy all of the conditions necessary to assign the Koach leases under the lease. The receiver further contended that the Ypsilanti lease could be rejected notwithstanding MCL 554.1027(8)(b) because the owner of the property was not a landlord; Skymint had been the tenant.[10] The receiver reiterated that he could reject the Ypsilanti lease without triggering the cross-default provision in the Grand Rapids lease and argued that Skymint was not in default on that basis. Again, the receiver's response to 3Fifteen was substantially similar.

After the motion to reject the leases was filed, the receiver provided a letter to the parties to the executory contracts and leases with Skymint. The letter was intended to inform them about Skymint Acquisition's ability to perform under the contracts and leases. The letter indicated that Skymint Acquisitions was a designee of Tropics. Sunstream Bancorp, Inc., was an affiliate of Tropics that strategically invested in the cannabis industry. Sunstream had invested over $400 million in loans to state-licensed cannabis operators. Skymint Acquisitions would discharge the credit bid other than specified sums, and $20 million was to be converted into a loan. Skymint Acquisitions would "also assume certain limited obligations specified in the Purchase Agreement, including the payment of cure obligations to counterparties to assigned contracts and leases." Skymint Acquisitions would be provided financing of up to $40.6 million by an affiliate or designee of Sunstream. On the sale date, Skymint Acquisitions anticipated that it would have no less than $10 million in available liquidity, and it would continue to operate the assets in the

---

[10] MCL 554.1027(8) prohibits an owner from rejecting tenant leases under specific circumstances.

ordinary course of business. Skymint Acquisitions anticipated an "[a]djusted EBITDA[11] of $10.0 million in 2024, $14.8 million in 2025, and $19.0 million in 2026."

A hearing on the matter was later held. At the hearing, the receiver argued that the cross-default provisions were not enforceable in the context of bankruptcy or the MRA. The receiver had the power to reject agreements that burdened the estate to make improvements to the business. A party whose contract was rejected was entitled to remedies, but the contracting party might not like the remedy. The rejection was deemed a breach of contract, and the nonbreaching party could assert a claim for damages resulting from the contract's rejection. The receiver opined that such a remedy was not desirable because the ultimate value of the assets would not yield a return to the creditors below the secured creditor in the priority scheme.

The receiver further argued that the same issues were dealt with "in an identical context in the bankruptcy process." He reasoned that the MRA and Bankruptcy Code are analogous because they grant the same powers and the language of the MRA mirrors that of the Bankruptcy Code. The receiver asserted that, in the bankruptcy context, cross-default provisions are not enforceable because they impose an impermissible restriction on the trustee's power and frustrate the debtor's ability to rehabilitate the business.

3Fifteen contended that the receiver had to assume the contracts for either all of the properties or for none of them. 3Fifteen argued that the parties were not in bankruptcy court and the bankruptcy relief was not available to Skymint. Instead, the case was governed by state law, which enforces contracts as written. 3Fifteen argued that just because the provisions in the MRA are similar to the Bankruptcy Code did not mean that "we get to mix and match the two"; the Legislature had written the MRA as it saw fit.

Koach argued that the MRA was designed to preserve the status quo but was being used to damage its rights. The MRA mostly concerned situations where an owner was in default to a lender in a real-estate project, and the law protected innocent tenants under commercially reasonable leases. Koach argued that Michigan had adopted the Uniform Commercial Real Estate Receivership Act (UCRERA), MCL 554.1011 *et seq*., word-for-word. The cross-default provisions had been put into place to protect the landlords of riskier leases. Koach explained that it would not have been willing to make the riskier Ypsilanti lease without the protection of the Grand Rapids lease and argued that the receiver was trying to remove negotiated language that Koach had attempted to protect itself with. Koach also argued that bankruptcy law applied to cases in which the debtor was trying to reorganize to move the business forward, but Skymint was selling its business, not rehabilitating it. Koach further argued that the MRA did not allow the receiver to "reject" leases. Instead, the MRA allowed it to "terminate" leases. Finally, the MRA provided for damages, but that did not preclude the operation of cross-default provisions.

---

[11] EBITDA stands for "earnings before interest, taxes, depreciation, and amortization," and "is a commonly used metric for valuing both franchise and non-franchise companies." Richard Greenstein & Richard Morey, *Valuation of Franchise Companies*, in *Mergers and Acquisitions of Franchise Companies* (Leonard D. Vines & Christina M. Noyes, eds., 2014).

Tropics argued that the landlords wanted to continue to receive above-market rents, but pointed out that receivership is an equitable proceeding. The only way for Skymint to survive and move forward was to get relief from some of its obligations that did not make sense. The receiver had authority through the statute and the court's order to grant the relief that the receiver had requested.

The trial court determined that the MRA granted broad powers to the receiver, including the powers to adopt or reject executory contracts. The MRA also "allow[ed] the Court to expand or modify any of those orders of, or any of those powers of the Receiver." The court's order appointing a receiver had granted the receiver the power to enforce, terminate, renegotiate, or abrogate existing agreements. The court opined that the powers of the receiver were broad for a reason, stating:

> [T]his is not the year where Skymint is profitable, paying its obligations, operating like a normal business entity. This is the year of receivership and receivership changes everything. And that's why these broad powers are given to the Receiver. Save the business. If save the business means sell it, save the business. And get rid of the contracts that will preclude a sale of what will then be an ongoing successful business concern. And that's the world of receivership.

The court ruled that, in the context of the equitable proceeding before it, it would not enforce the cross-default provisions. To sell the business, the receiver could not be put into an all-or-nothing position. It was the duty of the receiver and the court to pick and choose what would be good for the business and what would promote or thwart a sale. The court additionally determined that federal bankruptcy caselaw supported the court's belief that the powers of receivership are broad. It thus declined to enforce the cross-default provisions.

The court then considered whether the receiver could assign the leases without the landlord's consent. The court opined that the provisions of the leases concerning assignment had been met, including that the receiver had shown that the stalking horse bidder had the ability to perform under the leases.

Relevant to this appeal, Koach's attorney requested to be heard regarding the antiassignment clause because he had limited his oral arguments to the cross-default provision. The court indicated that it was "not required to give oral argument to everyone on everything." The court stated that it was satisfied by what the receiver had presented regarding the antiassignment clause. Koach indicated that the receiver had not addressed the antiassignment clause until the previous Friday in response to an objection that Koach had filed, which was the first time the receiver had asserted that he had complied with the antiassignment clause. The court stated, "I stand by my statements."

Koach's attorney later argued that, before an assignment could be made, the landlord was entitled to know who the client was, what their experience was, and what they were going to do with the property. Koach indicated that the assurance letter had been "the barest bones proforma [sic] of who they are and . . . they're an affiliate of the secured creditor." The receiver responded that they would have to confirm with the buyer but had provided an adequate assurance letter. The

-10-

receiver stated that issue had not been briefed. The court indicated that "you probably have to meet the requirements of 16.2[,]" which is one of the antiassignment provisions.

Ultimately, the trial court granted the receiver's motion to reject some of the 3Fifteen leases and prohibited 3Fifteen from declaring a default on the basis of those rejections. It ruled that the receiver's rejection did not affect Skymint's rights under any other lease. The court also authorized the receiver to reject the Ypsilanti lease. It prohibited Koach from declaring a default on the basis of that rejection and ruled that the rejection did not affect Skymint's rights under the Grand Rapids lease. The court determined that the terms of the stalking horse purchase agreement were in the best interests of Skymint's creditors and would maximize the value of the receivership estate. The receiver was permitted to sell the assets to the stalking horse bidder. The court then ruled that any provision in an assigned contract that

> purports to declare [Skymint] or the Stalking Horse Bidder in breach, in default or a payment right as a result of assignment, a change of control, and/or a cross-default provision is unenforceable. No assignment of any Assigned Contract pursuant to the terms of this Order shall in any respect constitute a default under any Assigned Contract.

Finally, the court determined that the stalking horse bidder had provided adequate assurances of future performance under the contracts. This appeal followed.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

We review de novo questions of law, *In re Receivership of 11910 S Francis Rd*, 492 Mich 208, 219; 821 NW2d 503 (2012), and issues of contractual and statutory interpretation, *MSSC, Inc v Airboss Flexible Prod Co*, 511 Mich 176, 189; 999 NW2d 335 (2023). We likewise review de novo a trial court's ultimate decision in an equitable action, but review the court's factual findings for clear error. *Wolfenbarger v Wright*, 336 Mich App 1, 32; 969 NW2d 518 (2021). Clear error exists if this Court is definitely and firmly convinced that the trial court made a mistake. *Id*.

We review for an abuse of discretion the trial court's decision to appoint a receiver, *Arbor Farms, LLC v GeoStar Corp*, 305 Mich App 374, 390; 853 NW2d 421 (2014), as well as a court's decision to limit oral arguments on a motion, *American Transmission, Inc v Channel 7 of Detroit, Inc*, 239 Mich App 695, 709; 609 NW2d 607 (2000). The trial court abuses its discretion when it chooses an outcome outside the range of reasonable outcomes. *Arbor Farms, LLC*, 305 Mich App at 390.

### B. DOCKET NO. 368240

In Docket No. 368240, Koach argues that the trial court erred by ruling that the receiver had the statutory authority to reject the Ypsilanti lease. We disagree.

This issue requires us to apply and construe several sections of the MRA. When interpreting a statute, our goal is to give effect to the intent of the Legislature. *Sunrise Resort Ass'n, Inc v Cheboygan Co Rd Comm*, 511 Mich 325, 333; 999 NW2d 423 (2023). The language

of the statute itself is the primary indication of the Legislature's intent. *McQueer v Perfect Fence Co*, 502 Mich 276, 286; 917 NW2d 584 (2018). This Court focuses on the statute's language and reads the statute as a whole, while also "reading individual words and phrases in the context of the entire legislative scheme." *Sunrise Resort Ass'n*, 511 Mich at 333-334 (quotation marks and citation omitted). Unambiguous statutory provisions must be enforced as written. *Id*. at 334. When applying and construing the MRA, "consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." MCL 554.1036.

The MRA allows a receiver to "[a]dopt or reject an executory contract of the owner as provided in [MCL 554.1027]." MCL 554.1022(2)(d). In the context of the MRA, " '[e]xecutory contract' means a contract, *including a lease*, under which each party has an unperformed obligation and the failure of a party to complete performance would constitute a material breach." MCL 554.1012(e) (emphasis added). Therefore, the plain language of the MRA explicitly grants the receiver the authority to reject leases.

Koach nevertheless argues that the trial court's order appointing the receiver did not allow the receiver to reject the lease because the order appointing the receiver used the word "termination" rather than the word "rejection." The basis of this argument appears to be that, by providing that the receiver could terminate a lease, the order appointing the receiver exceeded the boundaries of Michigan law. Again, the MRA allows a receiver to "[a]dopt or *reject*" executory contracts. MCL 554.1022(2)(d) (emphasis added). But here, the stipulated order appointing the receiver granted him the power to "enforce or *terminate* any existing contracts affecting the Receivership Property[.]" (Emphasis added.) It also provided that, "[u]pon Plaintiff's prior written consent, the Receiver or its designee may amend, modify, *terminate* or enter into new leases with respect to the Receivership Property or enter into or authorize the renewal or expansion of existing leases[.]" (Emphasis added.) Additionally, it granted the receiver the power to

> comply with, *terminate*, re-negotiate or abrogate any or all agreements, contracts, understandings or commitments entered into by any Defendant or its agents with respect to the Receivership Property to the extent permitted by applicable law, with no further obligation or liability, including the liability to pay any termination fee under such terminated contract[.] [Emphasis added.]

Koach is correct that the MRA does not grant the court the power to "terminate" a lease, and that the court's order did not grant the receiver the power to "reject" a lease, per the language used in the MRA. However, it is clear that the words are intended to be synonymous in this context. Moreover, it is well established that this Court generally does not "exalt form over substance," *Maiden v Rozwood*, 461 Mich 109, 135; 597 NW2d 817 (1999), or require trial courts to use "any formulaic or magic words," see *People v Babcock*, 469 Mich 247, 259 n 13; 666 NW2d 231 (2003) (quotation marks omitted). Further, the MRA provides that the powers of the receiver may be "expanded, modified, or limited by court order on reasonable notice as determined by the court." MCL 554.1027(4) (emphasis added). Thus, even if there was a practical difference

between "terminating" a lease and "rejecting" it, nothing precluded the trial court from ordering that the receiver could terminate a lease.[12]

Koach also argues that this Court should not hold that a receiver acting on behalf of a tenant may reject leases under the MRA. Koach contends that this is so because the MRA is modeled on the UCRERA, which is designed to maintain the status quo for mortgagors while foreclosure is sought. Contrary to Koach's argument, our review of the notes to the UCRERA indicates that the law does not refer solely to mortgagors. It is true that the UCRERA prefatory notes state that courts "commonly appoint receivers at the request of a mortgage lender that seeks to enforce a mortgage in default[.]" UCRERA, Prefatory Note. However, the notes also refer to the sale of property securing mortgage-backed securities and the unified sale of mixed real-and-personal-property collateral as an ongoing concern. UCRERA, Prefatory Note. Additionally, the comment to § 17, regarding executory contracts, explicitly refers to "contracts to obtain or provide services (such as cleaning, repair, landscaping, advertising, or marketing services)." UCRERA, § 17, official comment 1. These provisions do not support Koach's argument that the UCRERA's influence on the MRA indicates that the MRA's purpose is solely to maintain the status quo for mortgagors pursuing foreclosure.

Koach's argument on this point is also based on portions of MCL 554.1027 that indicate that a receiver cannot reject a tenant's lease. Specifically, under MCL 554.1027(8),

> (8) A receiver may not reject an unexpired lease of real property under which the owner is the landlord if 1 or more of the following apply:
>
> (a) The tenant occupies the leased premises as the tenant's primary residence.
>
> (b) The receiver was appointed at the request of a person other than a mortgagee.
>
> (c) The receiver was appointed at the request of a mortgagee and 1 or more of the following apply:
>
> (i) The lease is superior to the lien of the mortgage.

---

[12] We also note that Koach does not argue that terminating a lease and rejecting it are different in any practical way or that the outcome of the case was affected. This Court will not modify a decision of the trial court on the basis of a harmless error, MCR 2.613(A), which is an error that has no bearing on the outcome of the case. *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017). Ultimately, the trial court granted the receiver's motion to reject—not terminate—the Ypsilanti lease. Even were this Court to accept Koach's argument that the court erred by ordering that the receiver could "terminate" a lease, the court never ordered any leases terminated. Any error in the trial court's order was not decisive to the outcome of this case.

(*ii*) The tenant has an enforceable agreement with the mortgagee or the holder of a senior lien under which the tenant's occupancy will not be disturbed as long as the tenant performs its obligations under the lease.

(*iii*) The mortgagee has consented to the lease, either in a signed record or by its failure timely to object that the lease violated the mortgage.

In this context, the "owner" is "the person for whose property a receiver is appointed." MCL 554.1012(k). Applying that definition here, *Skymint* is the owner, not Koach. Understandably, MCL 554.1027(8) prohibits a receiver from rejecting leases when the owner is the landlord because those provisions protect innocent tenants. See UCRERA, § 17, official comment 1. However, the plain language of the MRA does not provide similar protections for landlords like Koach. Notably, although the Legislature could have provided that the receiver for a tenant also cannot reject commercially reasonable leases, it did not do so. "[A] court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Dye v Esurance Prop & Cas Ins Co*, 504 Mich 167, 180; 934 NW2d 674 (2019) (quotation marks and citation omitted). We will not "substitute our own policy decisions for those already made by the Legislature." *Id*. (quotation marks and citation omitted).

Koach additionally argues that the Ypsilanti lease cannot be rejected because it does not "relate to" the receivership property; rather, it *is* the property. The MRA provides that receivership property is "the property of an owner that is described in the order appointing a receiver or a subsequent order." MCL 554.1012(q). "[A] receiver may adopt or reject an executory contract of the owner *relating to* receivership property." MCL 554.1027(2) (emphasis added). The phrase "relating to" is not defined in the statute; thus, we may consult a dictionary to determine the term's meaning. See *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). The word "relate" means "to have a relationship or connection." *Merriam-Webster's Collegiate Dictionary* (11th ed).[13] Here, the receivership property was defined to include "leases" and "contracts." As earlier noted, Koach argues that the lease cannot relate to the receivership property because it is part of that property. However, nothing about the definition of the verb "relate" precludes something from having a connection with itself. This reading of the statute is thus not supported by the grammatical context of the phrase "relating to" in the statute. We therefore reject Koach's reading of the statutory language. Ultimately, Koach cannot show that the trial court erred by determining that the MRA granted the receiver the authority to reject the Ypsilanti lease.

C. DOCKET NOS. 368282, 368446, AND 368461

1. CROSS-DEFAULT PROVISION

---

[13] When consulting a dictionary for a definition of a word, this Court should determine the most pertinent definition in light of the word's context in the statute. *People v Hershey*, 303 Mich App 330, 342; 844 NW2d 127 (2013). Although there are numerous other meanings of the verb "relate," this appears the most appropriate from context.

In the remaining dockets, Koach and 3Fifteen argue that the trial court should not have been permitted to strike cross-default language from their contracts with Skymint. We disagree.

Receivership courts sit in equity. See *Hofmeister v Randall*, 124 Mich App 443, 445; 335 NW2d 65 (1983) (quotation marks and citation omitted) (stating that receivership is a matter of equity and that courts sitting in equity attempt to establish "as far as practicable, complete justice between the parties before it"). Tropics and the receiver contend that, as part of its equitable powers, a court may refuse to enforce cross-default language. In support of this argument, they cite MCL 554.1027(2), which generally states that "a receiver may adopt or reject an executory contract of the owner relating to receivership property," and "[t]he court may condition the receiver's adoption and continued performance of the contract on terms appropriate under the circumstances." MCL 554.1027(2) (emphasis added). The unambiguous terms of this provision appear to provide courts with broad discretion to allow receivers to adopt or reject executory contracts as needed. To that end, the trial court here deemed it appropriate, under the circumstances, to strike the cross-default provision and allow the receiver to adopt only certain leases.

Koach and 3Fifteen nevertheless argue that courts lack the power to modify unambiguous contracts, and, therefore, the trial court could not alter or refuse to enforce the unambiguous cross-default provision. It is true that generally, the judiciary cannot "modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties . . . ." *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005). However, as earlier noted, Koach and 3Fifteen fail to consider that a receivership court is acting in equity. "[A] court of equity molds its relief according to the character of the case; once a court of equity acquires jurisdiction, it will do what is necessary to accord complete equity and to conclude the controversy." *Wiand v Wiand*, 178 Mich App 137, 144; 443 NW2d 464 (1989) (citation omitted). Bearing that principle in mind, and considering the plain language of MCL 554.1027(2), we conclude that the trial court had authority to strike the cross-default provision.[14]

Koach additionally argues that this Court cannot possibly determine whether the equities were properly considered because the trial court did not explain why the equities favored Tropics as a creditor over Koach as a landlord. However, our reading of the record indicates that the trial court was aware that it was sitting in equity and that it rendered an equitable decision even though it did not make detailed findings of fact comparing the positions of the landlords and the receiver. The court stated, in part:

---

[14] Tropics and the receiver contend that we should look to federal bankruptcy law for guidance in this matter, noting that cross-default provisions are unenforceable under federal bankruptcy law, and that the MRA is analogous to the Bankruptcy Code. Contrary to their argument, however, "cross-default provisions are inherently suspect," but are not unenforceable under the Bankruptcy Code. *In re Liljeberg Enterprises, Inc*, 304 F3d 410, 445 (CA 5, 2002). Federal law requires only that the bankruptcy court balance the equities before striking a cross-default provision. Further, while the trial court may have found bankruptcy caselaw persuasive, the fact remains that this case proceeded under the Receivership Act, not the Bankruptcy Code. We thus decline to apply federal bankruptcy law in this instance.

[T]he Receivership Act very broadly does allow the Receiver to adopt or reject an executory contract. And it furthermore provides that it's, it's very broad in its granting of powers to Receivers . . . . It allows the Receiver to perform any duty imposed by Court order, this Act or law of the state, it allows that the powers and duties of a Receiver may be expanded, modified or limited by Court order.

The receivership Order in fact does allow the Receiver to enforce or terminate any existing contracts and to comply with, terminate, re-negotiate or abrogate any or all agreements, contracts, et cetera, et cetera. Again, the powers are very broad and they are very broad for a reason . . . . [T]his is not the year where Skymint is profitable, paying its obligations, operating like a normal business entity. This is the year of receivership and receivership changes everything. And that's why these broad powers are given to the Receiver. Save the business. If save the business means sell it, save the business. And get rid of the contracts that will preclude a sale of what will then be an ongoing successful business concern. And that's the world of receivership.

And for those reasons, I would not in this equitable proceeding enforce the cross-default provisions . . . .

The court additionally found that the receiver's power to pick and choose contracts existed for a good purpose and that the receiver needed to be able to choose between contracts in order to put the business back together. The court determined that selling the business and continuing to operate it profitably was the most important consideration. It likewise considered the arguments made by Koach and 3Fifteen that the cross-default provisions should be enforced, but found that instead, the receiver should eliminate the contracts that would preclude the sale of an ongoing, successful business concern. It is thus clear that the court was aware that the proceeding was equitable in nature and that it was making an equitable determination. We conclude that the court sufficiently balanced the equities before arriving at its ultimate conclusion, and that it did not err by striking the cross-default provision at issue in this matter.

## 2. ANTIASSIGNMENT PROVISION

Finally, Koach argues on appeal, and 3Fifteen argues in its reply brief,[15] that the trial court erred by concluding that the receiver could properly assign the leases to the stalking horse bidder without making a factual record on the matter. We agree.

In the court below, Koach argued in a written motion that the receiver was required to meet the requirements of § 16.1 for the contract to be properly assigned. Section 16.1 provides the

---

[15] 3Fifteen has not properly placed this argument before the Court. "Issues not specifically raised in an appellant's statement of questions presented are not properly presented to this Court." *Harper Woods Retirees Ass'n v City of Harper Woods*, 312 Mich App 500, 515; 879 NW2d 897 (2015); MCR 7.212(C)(5). 3Fifteen acknowledges that it did not raise this issue directly, and that it only argued the issue in response to the assertions of Tropics and the receiver.

-16-

conditions under which the lease may be assigned without Koach's permission. It states, in relevant part:

> 16.1. None of the following (each, a "Transfer"), either voluntarily or by operation of Applicable Laws, shall be directly or indirectly performed without Landlord's prior written consent, which consent shall not be unreasonably withheld: (a) Tenant selling, hypothecating, assigning, pledging, encumbering or otherwise transferring this Lease or subletting the Premises . . . . Notwithstanding the foregoing, Tenant shall have the right to Transfer, without Landlord's prior written consent, all of Tenant's interest in this Lease and the Premises to: . . . (iii) any entity that purchases all or substantially all of Tenant's assets (each, a "Permitted Transfer"), provided that (A) Tenant notifies Landlord in writing at least thirty (30) days prior to the effectiveness of such Permitted Transfer, (B) such Permitted Transfer is not a subterfuge by Tenant to avoid its obligations under this Lease, (C) Tenant remains fully liable under this Lease, (D) the person that will be the tenant under this Lease after the Permitted Transfer has a net worth (as of both the day immediately prior to and the day immediately after the Permitted Transfer) that is equal to or greater than the net worth of the transferring Tenant, and (E) Tenant otherwise satisfies the requirements of this Article with respect to such Permitted Transfer. Tenant's notice to Landlord of such Permitted Transfer shall include information and documentation showing that each of the above conditions has been satisfied, which documentation shall be reasonably acceptable to Landlord.

The receiver presented an assurance letter in response to Koach's objections that § 16.1 had not been satisfied. Koach argued that the assurance letter was not adequate to meet the contractual requirements. Koach contended that the letter had been "the barest bones proforma [sic] of who they are and . . . they're an affiliate of the secured creditor." The court responded that the receiver would "probably have to meet the requirements of 16.2", which contained specifications regarding what the written notice to the landlord was required to contain. That was the sum total of the court's findings on the matter. When Koach requested time to make its argument regarding the antiassignment provision, the trial court stated that it was "not required to give oral argument to everyone on everything."

Koach appears to concede that §§ 16.1(a)(iii)(A) and (B) have been met, but argues that further factual development is necessary to determine whether §§ 16.1(a)(iii)(C) through (E) have been met. Plaintiffs do not appear to dispute this, arguing only that Koach has not created a factual record to support its argument and concluding that the trial court correctly ruled that the leases could be assigned without consent. But our review of the record does not indicate whether these factors have been met, nor is it apparent that plaintiffs' three-page assurance letter meets the lease requirements. For example, it is not clear from the assurance letter whether Skymint agreed to remain fully liable on the lease after the assignment under § 16.1(a)(iii)(C). We also cannot discern from the assurance letter or from the record whether the stalking horse bidder's net worth would be equal to or greater than Skymint's net worth in accordance with § 16.1(D). Finally, under § 16.1(E), nothing in the record indicates that the other terms and requirements of the transfer have been satisfied. We thus remand this issue for an evidentiary hearing. Following such a hearing,

the trial court is directed to make the findings of fact it deems necessary to resolve the issue, see MCR 2.517, and render an appropriate judgment.

## III. CONCLUSION

The trial court did not err by rejecting the Ypsilanti lease and striking the cross-default provisions. However, the court failed to allow Koach to present argument and evidence in relation to the antiassignment provisions in the leases, instead relying solely on an assurance letter to conclude that the necessary requirements were met. On remand, the court shall hold an evidentiary hearing to determine whether the antiassignment provisions were properly imposed, and will thereafter make findings of fact and render its judgment.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Mark T. Boonstra
/s/ Anica Letica